UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JASON GRAB                                    CIVIL ACTION

VERSUS                                        NO: 09-3439 c/w 09-4128,
                                              09-7387, 10-838

TRAYLOR BROS., INC, KIEWET                    SECTION: "S" (1)
SOUTHERN CO., & MASSMAN
CONSTRUCTION CO., a Joint
Venture, ET AL.

ORDER AND REASONS

IT IS HEREBY ORDERED that the Joint Venture's Motion for Partial Summary Judgment

Regarding the Joint Venture's Duties (Doc. #196) is **GRANTED**, as to the Joint Venture's alleged

duties to obtain permits and comply with Title 33, Parts 62, 64, and 66 of the Code of Federal

Regulations, and those claims are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** as

to the Joint Venture's general duty to ensure that the TKM-14 survey tower was plainly visible to

mariners.

IT IS FURTHER ORDERED that Volkert & Associates, Inc.'s Motion for Summary

Judgment (Doc. #173) is **GRANTED**, and plaintiffs' claims against it are **DISMISSED WITH**

**PREJUDICE**.

BACKGROUND

Defendants, Boh Brothers; Traylor Bros., Inc., Kiewet Southern Co., & Massman

Construction Co., A Joint Venture (the "Joint Venture"); and Volkert & Associates, Inc. were

contractors involved in building the new I-10 Twin Span bridge over Lake Pontchartrain connecting

New Orleans, Louisiana with Slidell, Louisiana on behalf of the Louisiana Department of Transportation and Development ("DOTD"). The DOTD was the owner of the project. It designed the bridge, and obtained all of the necessary permits, including a Bridge Permit from the United States Coast Guard dated October 12, 2006, and a permit dated July 5, 2006 from the United States Army Corps of Engineers ("USACE") for the excavation and deposit of fill material to construct the on-ramps.

Boh Bros. built the approaches to the bridge. The Joint Venture built the high rise, or "hump," portion of the bridge. Volkert was a consulting engineer hired to oversee the project for the DOTD. Volkert provided "quality control" and acted as the DOTD's "eyes and ears" on the project to ensure that the contractors performed their work in accordance with the plans and specifications provided by the DOTD.

As part of its construction methodology, the Joint Venture erected four survey towers in Lake Pontchartrain near the bridge project. The first two survey towers, TKM-10 and TKM-11, were installed in May and June 2007, and the other two survey towers, TKM-13 and TKM14, were installed in October 2007. All of the survey towers stood seven to nine feet above the mean water line, depending on the tide. Each survey tower was constructed of a pipe that was 42 inches in diameter, which stood four to six feet above the water, with another 24 inch diameter pipe on top that extended an additional three feet. The survey towers were all marked with white navigational lights so that they could be seen at night.

On July 3, 2008, plaintiffs, Lary Abshire and Jacob Kinchen (collectively "plaintiffs"), iron workers, who were employed by Boh Bros. to work on the bridge, were injured when the crew boat

in which they were traveling from the work site to shore at the end of the day allided with the TKM-14 survey tower.  At the time of the accident, Kinchen, who was not a licensed captain, was operating the boat from a seated position inside the cabin.  His vision was allegedly obstructed by two large tires that his Boh Bros. supervisor placed on the front of the push knees on the bow of the boat.

Plaintiffs allege that the Joint Venture was negligent in failing to obtain a permit from the USACE to place the TKM-14 in the navigable waters of the United States, and in failing to file the form CG-2554 with the Coast Guard for authorization to mark the TKM-14.  Plaintiffs allege that these failures resulted in the Joint Venture's failure to properly mark, place signs on, light, and warn mariners about the survey towers.

The Joint Venture argues that it is entitled to summary judgment because it complied with the only duties it owed to mariners, including plaintiffs, regarding the TKM-14 survey tower. Specifically, the Joint Venture contends that its duties regarding marking and providing warnings about the TKM-14 survey tower were to mark the survey tower with a white navigational light, and to notify the Coast Guard of the survey tower's position so that notice of its existence would be published in the Local Notice to Mariners.  The Joint Venture argues that it did not have any duties to place any additional markings on the tower because it was clearly visible during the day due to its size.  The Joint Venture argues that because it compiled with its duties, it cannot be held liable for the July 3, 2008, accident.

Also, plaintiffs allege that Volkert was negligent for failing to ensure that the Joint Venture complied with the applicable laws and regulations regarding permitting and marking of the survey

3

towers.  They argue that Volkert had a duty under its contract with the DOTD to ensure that all of the contractors complied with all applicable laws, and to help identify, prevent, and solve problems that arose with the stakeholders.

Volkert argues that it is entitled to summary judgment because its role as the project inspector was to ensure that the contractors performed their work in accordance with the plans and specifications provided by the DOTD, and that it did not have any involvement with obtaining the permits for the project.  Volkert contends that the survey towers were part of the Joint Venture's construction methodology, over which it had no control.  Further, Volkert asserts that it reported the TKM-14 survey tower to the Coast Guard on October 18, 2007, and that the only marking required was the white navigational light.

## ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  If the opposing party bears the burden of proof at trial, the moving

party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.     Law Applicable to Volkert**

Plaintiffs contend that their claims against Volkert arise under the general maritime tort law, and that this court has jurisdiction over those claims.  Volkert argues that plaintiffs' claims against it arise under Louisiana law, and that the court has supplemental jurisdiction pursuant to 33 U.S.C. § 1367.

The United States Constitution extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2. Congress has embodied that power in 28 U.S.C. § 1333(1), which states in part that federal district courts have "original jurisdiction ... of ... [a]ny civil case of admiralty or maritime jurisdiction." The Extension of Admiralty Jurisdiction Act of 1948, 62 Stat. 496, invested "admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." Grubart, Inc. v. Great Lakes Dredge & Dock, 115 S.Ct. 1043, 1048 (1995) (involving Rule 12(b)(1) motion to dismiss for lack of admiralty jurisdiction).

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. §§ 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. 46 U.S.C.App. § 740. The connection test raised two issues. A court, first must "assess the general features of the type of incident involved," [Sisson v. Ruby, 110 S.Ct. 2892, 2896, (1990)], to determine whether the incident has "a potentially

disruptive impact on maritime commerce," id. at 2896, n. 2. Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." Id. at 2897, 2896, and n. 2.

Grubart, 115 S.Ct. at 1048.

The incident in this case, the crew boat's alliding with the TKM-14 survey tower, occurred on navigable water in Lake Pontchartrain, and an allision in navigable waters has "a potentially disruptive impact on maritime commerce." See Foremost Ins. Co. v. Richardson, 102 S.Ct. 2654, 2658-59 (1982). The activity giving rise to the alleged tort at issue is the Joint Venture's placement of the TKM-14 survey towers in navigable waters and an allision of a crew boat with that survey tower.

Volkert argues that its specific involvement in the Twin Span bridge project, inspecting the contractor's work to ensure compliance with the DOTD's plans and specifications, does not have a "substantial relationship to traditional maritime activity."  However, plaintiffs allege that Volkert was negligent for not ensuring compliance with laws that protect the safety of maritime commerce. The activity of ensuring compliance with laws regarding maritime safety during the building a bridge over navigable water, has a "substantial relationship to traditional maritime activity." Therefore, the general maritime tort law applies to plaintiffs' claims against Volkert, and this court has jurisdiction over those claims.

**C.      Negligence Under the General Maritime Law**

Pursuant to maritime tort law, allision "liability is based on fault; the mere fact of impact has no legal consequence." The JAVA, 81 U.S. (14 Wall.) 189 (1871).  "The analysis of a maritime tort is guided by general principles of negligence law." In re Signal Intern., LLC, 579 F.3d 478, 491 (5th Cir. 2009) (internal quotation and citation omitted).  "Under general tort principles, a tortfeasor is accountable only to those to whom a duty is owed." Id. "Duty is measured by the scope of the risk that negligent conduct foreseeably entails." Id. (internal quotation and citation omitted). "The test [of foreseeability] is whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct." Id. (internal quotation and citation omitted).  In order for liability to be established, a plaintiff must demonstrate that a duty is owed, a breach of the duty, an injury, and a causal connection between the defendant's conduct and the plaintiff's injury. Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000).

**D.      The Joint Venture's and Volkert's Libailty Regarding the Permitting of the TKM-14 Survey Tower**

Section 10 of the Rivers and Harbors Act provides that "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any waters of the United States is prohibited . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." 33 U.S.C. § 403.  In the General Bridge Act of 1946, Congress authorized "the construction, maintenance, and operation of bridges and approaches thereto over the navigable waters of the United States" provided that the plans were approved by the Secretary of Transportation before construction commenced.  Id. at § 525.  When the Coast Guard became part

7

of the Department of Transportation in 1967, the Secretary of Transportation delegated the authority

to issue bridge permits to the Commandant of the Coast Guard.  The Coast Guard retained authority

over bridge permits when it became part of the Department of Homeland Security in 2003.  See 33

C.F.R. § 114-18.160.  The Commandant of the Coast Guard has delegated final authority for

performing the functions of the Coast Guard to the District Commanders. 33 C.F.R. § 1.01-1.[1]

       The Coast Guard's policies and procedures for issuing bridge permits are found in the Bridge

Permit Application Guide (the "Application Guide"). COMPDTPUB P16591.3B (June 16, 1999),

www.uscg.mil/hq/cg5/cg551/.  The Application Guide defines "bridge" as:

> Any structure over, on, or in navigable waters of the United States
> used for transporting persons, vehicles, commodities or other
> physical matter and providing for the passage or flow of water
> through or under the structure.
>
> The term "bridge" includes all integral bridge elements: approaches
> and appurtenances, regardless of the materials used, whether natural
> or manufactured, or the **construction methodology**.

Id. at A-1 (emphasis added).  The Application Guide provides that the entity planning on

constructing a bridge over navigable waters of the United States must apply for a bridge permit, and

provide proposed plans. Id. at 2.  The permit usually includes a condition that the plans for

---

   [1]  The USACE regulations regarding permits required by Section 10 of the Rivers and Harbors Act are found in 33 C.F.R., Part 322.  Structures and/or work affecting the navigable waters of the United States generally require permits, and certain activities are permitted by the "nationwide general permits" of 33 C.F.R., Part 330. 33 C.F.R. § 322.3.  Nationwide Permit "NWP 15 - U.S. Coast Guard Approved Bridges," provides USACE authorization for "[d]ischarges of dredge or fill material incidental to the construction of bridges across navigable waters of the United States . . . provided such discharges have been authorized by the U.S. Coast Guard as part of the bridge permit."  72 Fed. Reg. 11092, 11184 (March 12, 2007).  NWP 15 does not include causeways and approach fills.  Because the Coast Guard has the authority to issue permits for bridges or causeways across navigable waters of the United States, NWP 15 provides USACE authorization for dredge or fill material into United States waters associated with the construction of bridges as required by Section 404 of the Clean Water Act, 33 U.S.C. § 1344. Id. at 11111.

temporary structures to be placed in the water to facilitate bridge construction must be submitted to and approved by the District Commander before the start of construction, and that plans for survey towers should be submitted to the District Commander for his approval prior to the commencement of construction. Id. at 20.  Further, the Application Guide provides that the permittee "must promptly notify the Coast Guard of the start of construction, any events affecting navigation during construction, and the completion of major phases of construction," so that it can publish the information in the Local Notice to Mariners to notify "waterway users of work in progress that may affect navigation." Id. at 7.  Violations of the laws pertaining to bridge permitting are enforced by the Coast Guard via criminal or civil proceedings.  33 C.F.R. § 114.40.

The DOTD, the entity constructing the Twin Span bridge, obtained the Bridge Permit from the Coast Guard, and it was responsible for any non-compliance therewith.

### 1.      The Joint Venture

Plaintiffs argue that the Joint Venture had a duty to apply for a permit from the USACE in order to erect the TKM-14 survey tower, file a form CG-2554 with the Coast Guard for authorization to mark it, and to mark it pursuant to the United States Aids to Navigation system found in Title 33, Parts 62, 64, and 66 of the Code of Federal Regulations.  Specifically, plaintiffs argue that the Joint Venture had a duty to paint its TKM-14 survey tower a bright color and mark it with geometrically shaped placards or a sign that would have made it more visible. Plaintiffs also argue that the Joint Venture had a duty to mark their work zone as restricted.

Title 33, Part 62 if the Code of Federal Regulations describes the general characteristics of to the U.S. Aids to Navigation System, and the policies and procedures pertaining to Federal aids

to navigation. 33 C.F.R. § 62.1 The U.S. Aids to Navigation System is administered by the Coast Guard and consists of Federal aids to navigation operated by the Coast Guard, aids to navigation operated by other armed services, and private aids to navigation operated by other persons.  <u>Id.</u>  By definition, the regulations in Part 62 apply only to aids to navigation operated by the Coast Guard. The regulations concerning the marking of structures, such as the Joint Venture's TKM-14 survey tower, are found in Title 33, Part 64 of the Code of Federal Regulations. <u>Id.</u>

Title 33, Part 64 of the Code of Federal Regulations "prescribes rules relating to the marking of structures, sunken vessels, and other obstructions for the protection of maritime navigation." <u>Id.</u> at § 64.01.  The Joint Venture's TKM-14 survey tower is a "structure" pursuant to § 64.06, which provides that "[s]tructures means any fixed or floating obstruction, intentionally placed in water, which may interfere with or restrict marine navigation," and an "obstruction" is "anything that restricts, endangers, or interferers with navigation." <u>Id.</u> at § 64.06.  Before a person places a structure in the navigable waters of the United States, the owner or operator of the structure must "apply for Coast Guard authorization to mark the structure in accordance with § 66.01-5," and the Commander of the Coast Guard District in which the structure is located "will determine the marking requirements." <u>Id.</u> at § 64.21.  "Markings" are "the lights and other signals on or near structures . . . for the protection of navigation." <u>Id.</u> at § 64.06.  The required markings must be established and maintained until the structure is removed or otherwise directed by the District Commander. <u>Id.</u> at § 64.23.

Section 66.01-5 provides the procedure for applying for markings on structures. The marking is considered a "private aid to navigation." <u>Id.</u> at § 66.01-5.  The applicant must complete a CG-2554

form and submit it to the Coast Guard District Commander.  Id.  The applicant must include the location of the aid, the name and address of the person at whose expense it will be maintained and who will maintain it, the time and dates during which it will operate, why it is necessary, and for lights, the color, characteristic, range, effective intensity, height above water, and description of illuminating apparatus.  Id.  The District Commander reviews the application for completeness, and assigns it a classification, which includes "[a]ids to navigation on marine structures . . . which the owners are legally obligated to establish, maintain and operate as prescribed by the Coast Guard." Id. at § 66.01-15.  However, the applicant must obtain authorization to erect the structure from the USACE "[b]efore any private aid to navigation consisting of a fixed structure is placed in the navigable waters of the United States." Id. at § 66.01-30.

The CG-2554 is an application for the proposed aid to navigation, not for authorization to construct the structure upon which the aid is to be placed.  Pursuant to 33 C.F.R. § 64.21, the Coast Guard authorizes the markings, not the structure. Instead, the USACE authorizes the structure pursuant to Section 10 of the Rivers and Harbors Act and the applicable regulations, unless Congress has authorized the structure. 33 U.S.C. § 403; 33 C.F.R., Part 322.  The USACE's permission is not required to construct a bridge, because Congress authorized the construction of bridges and approaches thereto over the navigable waters of the United States in the General Bridge Act of 1946. Id. at § 525.  Instead, the Coast Guard issues bridge permits that cover construction methodology. See 33 C.F.R. § 114-18.160; see also Application Guide, COMPDTPUB P16591.3B (June 16, 1999), www.uscg.mil/hq/cg5/cg551/.

The TKM-14 survey tower was part of the Joint Venture's construction methodology. It was covered under the DOTD's Coast Guard Bridge Permit, and the Joint Venture was not required to apply to the USACE for authorization to erect it.  A permit from the USACE is required before the Coast Guard will review the CG-2554.  Because the Joint Venture did not have a duty to obtain a USACE permit for a structure that was covered under the DOTD's bridge permit, it did not have a duty to submit the CG-2554 to the Coast Guard for authorization to mark the TKM-14 survey tower. Thus, the Joint Venture is entitled to summary judgment, and plaintiffs' claims regarding its alleged duties to obtain permits and comply with Title 33, Parts 62, 64, and 66 of the Code of Federal Regulations, and those claims are DISMISSED WITH PREJUDICE.

Although the Joint Venture did not have a statutory duty regarding permitting and marking the TKM-14 survey tower, as the entity that created a hazard to navigation, it had a duty to ensure that the TKM-14 survey tower was plainly visible to mariners in all operating conditions.  There are disputed issues of fact regarding whether the TKM-14 survey tower was plainly visible during daytime operating conditions.  Therefore, the Joint Venture is not entitled to summary judgment regarding its general duty to ensure that the TKM-14 survey tower was plainly visible to mariners.

### 2.      Volkert

Plaintiffs argue that Volkert had a duty under its contract with the DOTD to ensure compliance with all applicable laws, and to help identify, prevent and solve problems that arose with the stakeholders, i.e. the DOTD and the contractors.  Plaintiffs cite two portions of Volkert's contract with the DOTD in support of their arguments.  Plaintiffs cite a section titled "COMPLIANCE WITH LAWS" on page 10 of the contract, which states, in part, "[t]he Consultant

12

(Volkert) shall comply with all applicable Federal, State and local laws and ordinances, as shall all others employed by it in carrying out the provisions of this Contract."  Plaintiffs argue that this clause placed a duty upon Volkert to ensure compliance with all applicable laws, including those regarding permits and markings for the TKM-14 survey tower.

The clause does not impose a duty upon Volkert to ensure that the DOTD and the Joint Venture complied with applicable laws.  Instead, the clause places a duty on Volkert to ensure that it and its subcontractors complied with applicable laws.  Because the DOTD and the Joint Venture were not Volkert's subcontractors, this clause did not place a duty on Volkert to ensure that the DOTD and the Joint Venture complied with applicable laws.

Plaintiffs also rely on the second bullet point on page 5 of the contract which states: "Helping identify, prevent, and/or solve problems (real or perceived) that arises (sic) with stakeholders." Plaintiffs argue that this clause placed a duty on Volkert to identify the alleged problems with the permitting and marking of the TKM-14 survey tower.

The cited sentence is part of a portion of the contract titled "Public Information Support." The entire clause reads:

> **Public Information Support** - The goals for the public information plan will include the following:
>
> • Proactively providing accurate and timely information to the public on construction activities and possible traffic impacts.
>
> • Helping identify, prevent, and/or solve problems (real or perceived) that arises with stakeholders.
>
> • Enhancing the image of DOTD and its Consultants during the construction project.

> The central component of the public information plan will be the
> development and maintenance of a project website that will serve as
> a central repository for all project related news and information.

Examining the sentence cited by plaintiffs in context shows that it did not place a duty on Volkert

regarding the permitting and marking of the Joint Venture's TKM-14 survey tower.  Instead, this

section of the contract places a public relations duty on Volkert.

Plaintiffs also argue that Volkert assumed a duty to ensure that the TKM-14 survey tower

had the proper permits and markings by acting as a liaison between the Joint Venture and the Coast

Guard.  John Horn, a vice president at Volkert, was the project engineer for Volkert on the Twin

Span project.  He testified at his deposition that Volkert relayed information to the Coast Guard

when the contractors requested that it do so.  Such an exchange transpired with regard to the Joint

Venture's TKM-14 survey tower.

On October 18, 2007, Stephen Heraty, a Volkert employee who reported directly to Horn,

emailed Philip Johnson of the Coast Guard, to report the latitudinal and longitudinal coordinates for

the Joint Venture's TKM-13 and TKM-14 survey towers so that the information could be published

in the Local Notice to Mariners, with instructions for Johnson to email him if further information

was needed.  Johnson inquired how the survey towers were lit at night, and stated that  he had "not

had time to plot the locations, but it is probable that these towers are not covered under the bridge

permit itself and will require a separate permit from the Corps of Engineers."  On October 24, 2007,

the Coast Guard published the location of the survey towers in the Local Notice to Mariners, and

stated that the towers were lit with fixed white lights.

Heraty forwarded the email to Horn. Horn testified at his deposition that Volkert was not involved in obtaining the permits for the project, but rather, the DOTD obtained all necessary permits. Horn testified that he discussed Johnson's comment about whether the Joint Venture's TKM-13 and TKM-14 survey towers were included in the DOTD's bridge permit issued by the Coast Guard, and that the DOTD "felt like they were included in the permit as it stood." He also testified that there was no other discussion of the permit issue until the Coast Guard sent correspondence in 2009 regarding some mooring piles that were not included in the DOTD's permit because of their distance from the bridge. Horn testified that the Coast Guard never mentioned the Joint Venture's survey towers in that or any other correspondence, but the survey towers were included in the subsequent permit modification that addressed the mooring pilings "so there would never be anymore question about it." There is no evidence that the Coast Guard ever revisited the issue whether the Joint Venture's TKM-13 and TKM-14 survey towers were included in the DOTD's original bridge permit.

Horn's testimony shows that Volkert did not assume the duty of acquiring permits for the Twin Span project. As the DOTD's "eyes and ears" on the project, Volkert acted as a liaison for information regarding the TKM-14 survey tower and permitting issues. It informed the Coast Guard of the survey tower's location and discussed the purported permitting issues with the DOTD, but did not assume any duties outside the scope of the contract. Because the contract did not impose a duty on Volkert regarding the acquisition of permits, and Volkert did not assume such a duty, Volkert is entitled to summary judgment, and plaintiffs' claims against it are DISMISSED WITH PREJUDICE.

15

**CONCLUSION**

**IT IS HEREBY ORDERED** that the Joint Venture's Motion for Partial Summary Judgment Regarding the Joint Venture's Duties (Doc. #196) is **GRANTED**, as to the Joint Venture's alleged duties to obtain permits and comply with Title 33, Parts 62, 64, and 66 of the Code of Federal Regulations, and those claims are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** as to the Joint Venture's general duty to ensure that the TKM-14 survey tower was plainly visible to mariners.

**IT IS FURTHER ORDERED** that Volkert & Associates, Inc.'s Motion for Summary Judgment (Doc. #173) is **GRANTED**, and plaintiffs' claims against it are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this ___4th___ day of May, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

16