UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JASON GRAB** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-3439 C/W 09-4128, 09-7387, 10-838** |
| **TRAYLOR BROS., INC, KIEWET SOUTHERN CO., & MASSMAN CONSTRUCTION CO., a Joint Venture, ET AL.** | **SECTION: "S" (1)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Jacob Kinchen and Lary Scott Abshire (collectively "plaintiffs"), filed suit against Boh Bros. Construction Co., L.L.C. and Traylor Bros., Inc., Kiewet Southern Co., & Massman Construction Co., A Joint Venture (the "Joint Venture") alleging that the defendants are liable for a July 3, 2008, boating accident in which plaintiffs were injured.

Boh Bros. and the Joint Venture were contractors involved in building the new I-10 Twin Span bridge over Lake Pontchartrain connecting New Orleans, Louisiana with Slidell, Louisiana on behalf of the Louisiana Department of Transportation and Development ("DOTD"). The DOTD was the owner of the project. Boh Bros. built the approaches to the bridge. The Joint Venture built the high rise, or "hump," portion of the bridge.

As part of its construction methodology, the Joint Venture erected four survey towers in Lake Pontchartrain near the bridge project identified as TKM-10, TKM-11, TKM-13 and TKM14. All of the survey towers stood seven to nine feet above the mean water line, depending on the tide. Each survey tower was constructed of a pipe that was 42 inches in diameter, which stood four to six feet

above the water, with another 24-inch in diameter pipe on top that extended an additional three feet. The survey towers were all marked with white navigational lights.

On July 3, 2008, plaintiffs, ironworkers, who were employed by Boh Bros. to work on the bridge, were injured when the crew boat in which they were traveling from the work site to shore at the end of the day allided with the TKM-14 survey tower. The crew boat was 22 feet and six inches in length, and had an enclosed cabin with an elevated captain's chair on the starboard side. There were two push knees on the bow of the crew boat. At the time of the accident, Kinchen, who was not a licensed captain, was operating the crew boat from a seated position inside the cabin. His vision was obstructed by two large tires that his Boh Bros. supervisor, Joe Martin, had placed on the front of the push knees to cushion the impact of the crew boat's docking.

At the time of the accident, Kinchen was employed by Boh Bros. as an ironworker foreman, and Abshire was employed by Boh Bros. as a journeyman ironworker. July 3, 2008, was Abshire's first day on the job.

The trial was "bifurcated" into three segments.

A four day bench trial was held from May 5, 2011 to May 10, 211, on the issues of Abshire's seaman status, plaintiffs' Jones Act claims against Boh Bros., plaintiffs' unseaworthiness claims against Boh Bros., and plaintiffs' general maritime law claims against the Joint Venture.

**A.    Seaman Status**

The Jones Act provides a cause of action for a "seaman" who is injured in the course of his employment. 46 U.S.C. § 30104. Plaintiffs bear the burden of establishing seaman status. Becker v. Tidewater, Inc., 335 F.3d 376, 390 n. 8 (5th Cir.2003).

In Chandris, Inc. v. Latsis, 115 S.Ct. 2172, 2186 (1995), the Supreme Court of the United States recognized that the "the Jones Act inquiry is fundamentally status based: land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." The test established in Chandris for determining whether an employee is a seaman under the Jones Act is twofold: (1) the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission"; and (2) the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Id. at 2189-90.

On March 15, 2011, the court granted Kinchen's motion, finding that Kinchen was a Jones Act seaman. The court denied Abshire's motion regarding seaman status finding that, although he contributed to the function of a vessel in navigation and that his work was maritime in nature, there were questions of fact regarding whether he satisfied the duration requirement.

**1.    Kinchen**

In its post-trial proposed findings of fact and conclusions of law, Boh Bros. asks the court to reconsider its ruling regarding Kinchen's seaman status. Boh Bros. argues that Kinchen did not have a connection to a vessel that is substantial in nature because he did not "go to sea." Relying

3

on Harbor Tug Barge Co. v. Papai, 117 S.Ct. 1535 (1997), Boh Bros. argues that Kinchen was not exposed to the perils of the sea because he did not sleep, eat supper, stand watch, or sail aboard the BIG MAC, the big crane barge that served as the ironworkers' base of operations.

In Papai,117 S.Ct. at 1540, 1542, the Supreme Court of the United States stated that "the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea," and that Jones Act coverage is afforded to "those workers who face regular exposure to the perils of the sea." The Court explained that this consideration would be "helpful in distinguishing land-based from sea-based employees." Id. at 1540. The Court did not articulate specific factors that are required for a determination that a maritime worker is exposed to the perils of the sea.

In In re Endeavor Marine Inc., 234 F.3d 287, 291-92 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit stated that Papai, was not intended to "articulate a new and specific test for seaman status." Instead, the court interpreted Papai as reiterating the point in Chandris, that Supreme Court of the United States:

> eschew[s] the temptation to create detailed tests to effectuate the congressional purpose, tests that tend to become ends in and of themselves. The principal formulations employed by the Courts of Appeals—"more or less permanent assignment" or "connection to a vessel that is substantial in terms of its duration and nature"—are simply different ways of getting at the same basic point: The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to "the special hazards and disadvantages to which they who go down to sea in ships are subjected."

Endeavor Marine, 234 F.3d at 292 (quoting Chandris, 115 S.Ct. at 2190).  Thus, the United States Court of Appeals for the Fifth Circuit concluded that the Supreme Court of the United States did not create a singular rule for determining seaman status, and that a jury could reasonably find that the plaintiff in Endevor Marine, a crane operator who was injured while working on the Mississippi River, was a Jones Act seaman.

Therefore, the fact that Kinchen did not sleep, eat supper, stand watch, or sail aboard the BIG MAC does not preclude a finding that he was a Jones Act seaman.  He had a connection to a vessel in navigation that was substantial in duration and nature because he was regularly exposed to the perils of the sea and spent more than 30% of his time working aboard the vessel.

**2.      Abshire**

In determining whether and employee has a substantial connection to a vessel or an identifiable fleet of vessels under common ownership in navigation, Chandris, 115 S.Ct. at 2191, adopted the position taken by the United States Court of Appeals for the Fifth Circuit that "[a] worker who spends less then about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."  However, the Court explained that the 30 percent rule of thumb:

> serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, "[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it."

Id. (quoting McDermott Int'l, Inc. v. Wilander, 111 S.Ct. 807, 818 (1991)).

Additionally, the Chandris Court articulated a "no snapshot" doctrine for evaluating a maritime employees seaman status. See Id. at 2191-92. Pursuant to this doctrine, "a court does not evaluate a worker's connection to a vessel or fleet at the moment of injury." Instead, if the employee is injured shortly after his employment began or his position with the same employer changed, "the court must consider his intended relationship to the vessel, as if he had completed his mission uninjured. Foulk v. Donjon Marine Co., Inc., 144 F.3d 252, 259 (3rd Cir. 1997) (court held that a jury could reasonably find that a commercial diver who was injured on the first day of a 10 day assignment was a Jones Act seaman) (citing Chandris, 115 S.Ct. at 2191-92).

Abshire was injured on his first day working for Boh Bros. as an ironworker aboard the BIG MAC to construct the new Twin Span bridges. Boh Bros.'s project superintendent on the Twin Span bridge project, William Moulton, testified that if Abshire had not been injured, Abshire would have continued in his position as a journeyman ironworker working on the project until the project was finished, which was approximately seven months from the date of the accident. Therefore, the court must consider Abshire's intended relationship to the BIG MAC for those seven months.

The ironworker crew was responsible for all components of placing the girders on the bridge structure. This work included erecting work platforms around the pilings, setting caps on the pilings, setting pads, and setting girders. They also assisted the navigation of the BIG MAC to move it to the next work station. The BIG MAC was used to lift girders, materials, and crew members to construct the bridge.

Kinchen, Jason Grab, and Anthony Harvey, who were all ironworkers assigned to the BIG MAC, testified that all of the ironworkers were cross-trained to perform all duties necessary to

perform their job. Some of the duties were performed on the BIG MAC and others were performed on the bridge structure.

Kinchen, was Abshire's supervisor, testified that Abshire would have spent about 60% of his time on the BIG MAC and 40% of his time on the bridge structure while performing his duties as a journeyman ironworker. Kinchen testified that the crew set girders two days per week, and this work would require some men to remain on the bridge structure for the entire day. He also testified that the ironworker crew set caps and platforms the rest of the time, and that a journeyman ironworker would be on the barge during this activity. Kinchen also testified that journeymen and apprentice ironworkers are not entirely interchangeable because an apprentice cannot act as a flag man on the barge.

Also, Jason Grab, an apprentice ironworker, testified that he spent approximately 30% to 40% of his time on the BIG MAC, and the remainder on the bridge structure. Anthony Harvey, another apprentice ironworker, testified that the ironworker crew spent about 40% of their time on the BIG MAC during an average week.

Martin testified that Abshire would have spent 100% of his time on the bridge structure when the ironworker crew was setting girders. Martin did not testify as to how much time Abshire would have spent on the bridge structure while they were setting caps or platforms. However, Martin did testify that Kinchen, who was also a journeyman ironworker, spent 30% to 40% of his time on the barge during the course of the project.

Kinchen's testimony regarding the amount of time Abshire would have spent on the BIG MAC versus on the bridge structure relates to the project as a whole, whereas Martin offered

7

testimony regarding girder setting work which was performed only two days per week. Kinchen's testimony, along with Grab's and Harvey's testimony, demonstrate that Abshire would have spent at least 30% of his time on the BIG MAC. Therefore, Abshire satisfies the duration requirement of the Chandris test and he is a Jones Act seaman.

**B.     Plaintiffs' Jones Act Negligence and Unseaworthiness Claims against Boh Bros.**

Jones Act negligence and unseaworthiness claims are separate causes of actions and are treated as such. See Brunner v. Maritime Overseas Corp., 779 F.2d 296, 298 (5th Cir.1986). In this case, the basis of both the negligence and unseaworthiness claims by Kinchen and Abshire against Boh Bros. is that Kinchen's vision was allegedly obstructed by tires placed on the crew boat's push knees, the crew boat lacked navigational aids, and that Kinchen was not properly trained to pilot the crew boat.

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence, including the negligence of the employer's officers, agents, or employees, caused the seaman's injury. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir.1997) (*en banc*); see also Hopson v. Texaco, Inc., 86 S.Ct. 765, 766 (1966). The employer is held to a standard of ordinary prudence under the circumstances. Id. "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." Id. The terms "slightest" and "featherweight" have been used to describe the reduced standard of causation between the employer's negligence and the employee's injury. Id. at 335; Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5th Cir.1988).

The Jones Act adopts a comparative negligence standard in which a seaman's recovery is reduced in proportion to his fault if he contributes to his own injury by not exercising ordinary prudence under the circumstance. Johnson v. Cenac Towing, 544 F.3d 296, 302 (5th Cir. 2008). "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable *seaman* in like circumstances." Id. (quoting Gautreaux, 107 F.3d at 399) (emphasis in original)). An employer must show that the seaman's negligence "'played any part, even the slightest, in producing the injury'" to establish the seaman's comparative negligence. Id. (quoting Chisholm v. Sabine Towing & Transp. Co., Inc., 679 F.2d 60, 62 (5th Cir. 1982)).

"[L]iability based upon unseaworthiness is wholly distinct from liability based upon negligence." Usner v. Luckenback Overseas Corp., 91 S.Ct. 514, 517(1971). The duty to provide a seaworthy vessel is absolute and completely independent of the duty under the Jones Act to exercise reasonable care; therefore, a showing of negligence is not required. See Phillips v. W. Co. of N. Am., 953 F.2d 923, 928 (5th Cir.1992). "Although the shipowner has an absolute duty to provide a seaworthy vessel, the vessel need not be 'accident free.'" Simeon v. T. Smith & Son, Inc., 852 F.2d 1432, 1432-33 (5th Cir. 1988). "For a vessel to be found unseaworthy, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used." Jackson v. OMI Corp., 245 F.3d 525, 527 (5th Cir.1992). An isolated personal negligent act of a fellow seaman does not render a vessel unseaworthy. Usner, 91 S.Ct. at 517. However, a vessel may become unseaworthy if a

fellow seaman engages in "congeries of negligent acts that are of such a character or that continue for such a length of time that they become related to the status of the vessel." Robinson v. Showa Kaiun K.K., 451 F.2d 688, 690 (5th Cir.1971).

Prior to the July 3, 2008, allision, Martin affixed a tire to the top of each of the crew boat's push knees with a metal cable. The tires sat on top of the push knees in a manner that obstructed the crew boat pilot's vision. James Ellison, the BIG MAC's crane operator, testified that he piloted the crew boat with the tires affixed to the push knees and that the tires obstructed approximately 75% of his vision when he was seated in the captain's chair. Kinchen testified that 60% to 80% of his vision was obstructed by the tires. Also, Harvey, who piloted the crew boat on occasion, testified that he unsuccessfully tried to remove the tires to cure the obstruction, and that he informed Jeff Gustafson, an ironworker foreman, about the issue, but that Gustafson told him not to say anything because Martin, his supervisor, had installed the tires. Moulton testified that he knew the tires were affixed to the top of the push knees and did not object. Lester Unteriner, Boh Bros.'s safety man on the project, testified that the tires should not have been on top of the push knees. Further, the photographs of the crew boat after the accident with the tires on the push knees and the video showing the operation of a similar crew boat with tires placed on the push knees in a like manner demonstrate that the tires created a profound visual obstruction.

This evidence demonstrates that Boh Bros. was negligent because it was aware that the tires created a visual obstruction, and did not remedy the situation which was created by its employee, Martin. Further, the evidence demonstrates that the placement of the tires on the push knees rendered the crew boat unseaworthy.

Kinchen's testified that he hit the TKM-14 because he did not see it and that the only reason he did not see it was because the tires obstructed his vision. The court finds the tires created an obstruction to the vision of the operator of the vessel, and that the placement of the tires in that position constituted Jones Act negligence. Therefore, Boh Bros. is liable to plaintiffs both for Jones Act negligence and under the doctrine of unseaworthiness.

However, Kinchen's recovery must be reduced by his comparative negligence. Kinchen testified that approximately 60% to 80% of his vision was obstructed by the tires. Kinchen also testified that he was aware of TKM-14's existence and that the route he chose through the Joint Venture's work area would take him in close proximity to it. Kinchen, Ellison and Abshire testified that Kinchen turned around several times during the voyage to speak to Ellison who was seated behind him. Because Kinchen was not paying full attention to piloting the crew boat through an area that he knew was a construction zone when his vision was obstructed by the tires, the court finds he is 50% at fault for the allision.

**C.      Plaintiffs' General Maritime Law Tort Claims Against the Joint Venture**

Plaintiffs' claims against the Joint Venture arise under general maritime tort law. "The analysis of a maritime tort is guided by general principles of negligence law." In re Signal Intern., LLC, 579 F.3d 478, 491 (5th Cir. 2009) (internal quotation and citation omitted). "Under general tort principles, a tortfeasor is accountable only to those to whom a duty is owed." Id. "Duty is measured by the scope of the risk that negligent conduct foreseeably entails." Id. (internal quotation and citation omitted). "The risk [of foreseeability] is whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct." Id. (internal quotation and citation

11

omitted).  In order for liability to be established, a plaintiff must demonstrate that a duty is owed, a breach of the duty, an injury, and a causal connection between the defendant's conduct and the plaintiff's injury.  Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000).

Plaintiffs allege that the Joint Venture breached its duty to ensure that the TKM-14 was readily visible.  Ellison testified that July 3, 2008, was a clear day.  Several witnesses who worked on the Twin Span bridge project construction site testified that the Joint Venture's survey towers were visible from approximately a mile away on a clear day.  Further, the Joint Venture did not have a duty to mark the TKM-14 or indicate that its work area was restricted pursuant to Title 33, Parts 62, 64, and 66 of the Code of Federal Regulations

Kinchen testified that he hit the TKM-14 because he did not see the tower, and that the only reason he did not see the tower was because of the tires on the push knees of the crew boat.  Therefore, there is no causal connection between any conduct of the Joint Venture regarding the visibility of the TKM-14 and the plaintiffs' injuries.

Abshire's injuries were caused by the combination of the negligence of Kinchen, a Boh Bros. employee, and the unseaworthiness of the vessel caused by another Boh Bros. employee, Martin, by installing the tires on the top of the push knees.  Abshire is therefore entitled to recover 100% of his damages against Boh Bros.

## CONCLUSION

Boh Bros. is liable for the damages plaintiffs' sustained in the boating accident of July 3, 2008, which were caused by a combination of Kinchen's negligence and the vessel's

unseaworthiness. However, Kinchen's recovery is reduced by 50% to account for his comparative negligence.

Judgment is rendered in favor of the Joint Venture and against plaintiffs, dismissing all claims against the Joint Venture.

New Orleans, Louisiana, this  21st  day of June, 2011.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**