UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JASON GRAB | CIVIL ACTION |
| VERSUS | NO: 09-3439 C/W 09-4128, 09-7387, 10-838 |
| TRAYLOR BROS., INC, KIEWET SOUTHERN CO., & MASSMAN CONSTRUCTION CO., a Joint Venture, ET AL. | SECTION: "S" (1) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Jacob Kinchen, filed suit against Boh Bros. Construction Co., L.L.C. ("Boh Bros.") and Traylor Bros., Inc., Kiewet Southern Co., & Massman Construction Co., A Joint Venture (the "Joint Venture") alleging that the defendants are liable for a July 3, 2008, boating accident in which he was injured. Liability has been determined in the first part of the bifurcated trial. This part of the trial was to determine Kinchen's damages.

Boh Bros. and the Joint Venture were contractors involved in building the new I-10 Twin Span bridge over Lake Pontchartrain connecting New Orleans, Louisiana with Slidell, Louisiana on behalf of the Louisiana Department of Transportation and Development ("DOTD"). The DOTD was the owner of the project. Boh Bros. built the approaches to the bridge. The Joint Venture built the high rise, or "hump," portion of the bridge. As part of its construction methodology, the Joint Venture erected four survey towers in Lake Pontchartrain near the bridge project identified as TKM-10, TKM-11, TKM-13 and TKM14

On July 3, 2008, Kinchen, an ironworker, who was employed by Boh Bros. to work on the bridge, was injured when the crew boat that he was piloting from the work site to shore at the end of the day allided with the TKM-14 survey tower. At the time of the accident, Kinchen, who was not a licensed captain, was operating the crew boat.

On a motion for summary judgment filed by Kinchen, this court ruled that Kinchen was a Jones Act seaman. Kinchen contributed to the function of and accomplishment of the mission of the BIG MAC, the vessel from which the Boh Bros. ironworkers worked on constructing the bridge, and he had a substantial connection to the BIG MAC in duration and nature. See Chandris, Inc. v. Latsis, 115 S.Ct. 2172, 2189-90 (1995).

After a trial regarding liability, this court found that Kinchen and Boh Bros. were each 50% at fault for the accident, and no fault was attributed to the Joint Venture. A bench trial to determine Kinchen's damages was held on July 6, 2011.

**A.     Kinchen's Injuries**

On the date of the accident, Kinchen was 28 years old. When the crew boat hit the TKM-14, Kinchen was thrown forward. His torso hit the crew boat's steering column and his face went through the front windshield. Kinchen sustained severe facial lacerations that exposed facial tissue and the bony skeleton. Kinchen also had intraoral lacerations and avulsed teeth. James Ellison, Kinchen's co-worker and a passenger in the crew boat, testified that Kinchen's face was hanging. Kinchen was unable to speak, but he was able to pilot the boat to shore.

1.      **Northshore Regional Medical Center**

Kinchen was taken by ambulance to Northshore Regional Medical Center in Slidell, Louisiana, where he underwent testing that revealed his injuries to be: (1) multiple complex and severe lacerations to his face, lips and oral cavity; (2) fractured nose and septum; (3) multiple avulsed and broken teeth; and, (4) multiple lacerations and contusions to his shoulders, knees, arms, wrists, and chest.  Northshore Regional Medical Center was unable to treat Kinchen's injuries, and he was transferred by ambulance to University Hospital in New Orleans, Louisiana.

2.      **University Hospital**

At University Hospital, Dr. Matthew Wise, a general and plastic surgeon, performed emergency surgery on Kinchen to repair his facial and intraoral lacerations. In his clinical report, Dr. Wise describes Kinchen's injuries as follows:

> The patient had multiple impressive lacerations of his face, many of them extending down to the facial skeleton.  The most impress[ive] of these lacerations extended for approximately 1 cm below the left eyelid and extended directly inferiorly, looped medially at the labia-mental crease across the midline and then curved superiorly again up into the right cheek thus completely detaching the lower lip from the lower jaw and in the same laceration complex deglove the anterior nasal spine and anterior nasal cavity. . . . Also of note the patient had an additional left lower eyelid laceration, which was also complex . . . .

Kinchen's facial lacerations required approximately 700 to 800 stitches.  Kinchen has permanent scars above his left eye, in a U-shape down his left cheek to his chin, on his lips, and around his mouth and nose, and on his forehead.  He also has lost sensation in his upper lip and around his mouth, extending through his left cheek.  Kinchen's speech has been affected, and he slurs and

mispronounces words, and has a lisp. Further, he cannot smile normally and has difficulty eating and drinking normally.

After the surgery, Kinchen experienced increased pain in his right arm, chest, and abdomen. An x-ray of his right arm revealed that it was broken. Kinchen was discharged from University Hospital on July 5, 2008.

### 3. Post-Release Visit to Dr. Wise's Office

On July 6, 2008, Kinchen saw Dr. Wise at a follow-up visit. Because Kinchen's abdominal pain was increasing, Dr. Wise ordered a CT-scan.

### 4. North Oaks Medical Center

Because the increasing abdominal pain did not subside, on July 8, 2008, Kinchen was taken by ambulance to the emergency room at North Oaks Medical Center in Hammond, Louisiana. Dr. Robert Kidd reviewed the CT-scan performed at Dr. Wise's office, and determined that Kinchen had bilateral atelectasis with pleural effusion, and a right renal artery tear with associated blood collection and swelling within and surrounding his right kidney. Dr. Kidd performed emergency surgery to place a stent in Kinchen's ureter between his kidney and bladder to relieve the renal swelling, and inserted a Foley catheter. Kinchen was released from North Oaks Medical Center on July 10, 2008. He was ordered to remain on bed rest and a liquid diet.

On August 14, 2008, Kinchen was readmitted to North Oaks Medical Center, and Dr. Kidd performed surgery to remove the stent. After a few weeks, Kinchen experienced elevated blood pressure, and Dr. Kidd referred him to Dr. Tahseen Rab, a nephrologist, and Dr. Michael Dunn, a family medicine practicioner.

### 5. Dr. Tahseen Rab

Dr. Rab is an expert in nephrology. He initially saw Kinchen on referral from Dr. Kidd and Dr. Dunn on February 12, 2009. Kinchen's blood pressure was 190/110. Dr. Rab diagnosed renovascular hypertension caused by a renal artery tear and damage to Kinchen's right kidney. Dr. Rab attributes this condition to the trauma in the July 3, 2008, allision. Dr. Rab prescribed Coreg CR, 40 milligrams per day; Norvasc, 10 milligrams per day; Micardis, 80 milligrams per day; and Maxzide, 37.5/25 once per day. Kinchen's blood pressure was reduced to 140/80. According to Dr. Rab, Kinchen must take these medications for life, and he may have to increase the medications as he ages because of his kidney damage and advancing sclerosis of the arteries may cause his blood pressure to rise.

Dr. Rab defers to Dr. Dunn to evaluate Kinchen's other conditions, but he will monitor the blood pressure and kidney function every five to six months for the rest of Kinchen's life. Among the problems associated with uncontrolled high blood pressure are brain injury, eye injury, heart injury, and kidney disease. However, Dr. Rab testified that Kinchen's kidney function has not deteriorated, and his blood pressure is controlled at this time.

Dr. Rab currently charges $86 per office visit. Further, Kinchen's pharmacy records show that he incurs the following monthly medication expenses related to his renovascular hypertension: (1) $136.51 per month for Coreg; (2) $101.36 per month for Micardis; (3) $14.17 per month for Triamterene, a generic form of Maxzide; and (4) $70.93 per month for Amlodipine Besylate, a generic form of Norvasc.

### 6. Dr. Daniel Trahant

Dr. Daniel Trahant, a general practitioner with an emphasis in neurology, testified that the nerve damage in Kinchen's face is permanent, and the nerves will never regenerate. He opines that more probably than not Kinchen will become impotent as a side effect of the anti-hypertensive medications he must use. Dr. Trahant further opines that even on medications Kinchen is still at increased risk of a stoke because of the vascular changes caused by the accident.

### 7. Dr. Nancy Mellin

Dr. Nancy Mellin, a certified otolaryngologist (ENT), first saw Kinchen on September 15, 2008. Kinchen complained of nosebleeds and nasal congestion. She diagnosed a deviated nasal septum, with airway obstruction of about 30% on the right.[1] She prescribed antibiotic ointment (Bactroban) to heal the wound. On October 13, 2008, Kinchen reported less bleeding, less facial pain, but continued nasal congestion. He complained of nasal whistling. Dr. Mullin diagnosed a nasal septal perforation.

On December 15, 2008, Kinchen reported the nosebleeds had resolved, but he still had whistling in his nose. Dr. Mullin described the perforation as approximately 1.5 centimeters in diameter.

On the January 16, 2009, visit, Kinchen complained again of nasal congestion, pain, and a running nose. The perforation had increased to 2 centimeters. Because the perforation was getting

---

[1] Dr. Mellin refers to post operative notes from July, 2008, ". . . a complete avulsem of separation of the septal components of the nose up to the column portion of the nasal aperture . . . " The septum was repositioned into its middle anatomical position.

larger, Dr. Mellin discussed surgical repair, although she told Kinchen of the chance of a failed repair.

On the March 16, 2009, visit, the whistling had worsened, and a decision was made to go forward with the surgery. At the May 11, 2009, pre-operative visit, surgery was scheduled for May 19, 2009. While Kinchen was under general anesthesia, Dr. Mellin "made the repair using material harvested from cadavers over which surrounding tissue is expected to grow to recreate the septum." At surgery, the perforation had increased to 3 centimeters square.

On June 8, 2009, Dr. Mellin suspected that the surgery had failed. By July 9, 2009, she determined that Kinchen was healing normally, but by the next visit on September 14, 2009, she knew that the surgical repair had failed, and the perforation again measured 2 centimeters. Kinchen reported breathing better and no longer having whistling. Dr. Mellin did not recommend a second attempt at the surgical repair. However, she suggested the possibility of another surgical technique by another ENT surgeon using turbinate flaps or a septal button.

Dr. Mellin opined that the condition will not ever heal itself, and Kinchen will continue to have nosebleeds. As stated above, further surgery may be clinically indicated.

The charges for Dr. Mellin's services are noted in her records, and have all been paid. No estimates of future medical chargers were introduced regarding this component of Kinchen's damges. However, Dr. Mellin opined that other surgery would be "complex, and more detailed, and the more lengthy, of a procedure that is involved, typically, the medical expenses tend to be larger."

### 8. Dr. J. Skelly Kreller

Dr. J. Skelly Kreller, an expert oral and maxillofacial surgeon, treated Kinchen for the injuries to his teeth. He testified by deposition that he first saw Kinchen on July 28, 2008. He noted severe injuries of the teeth, with fractures of the roots above the gumline of teeth numbers 9, 25, 26, 27, and 28, with number 24 totally avulsed, or "loose and just hanging there." He catagorized teeth numbers 9, 25, 26, 27, and 28 as Class III fractures, indicating the fracture extended through three layers of the tooth: the enamel, the dentin, and the nerve, with the exception of tooth number 9. Additionally, teeth numbers 6, 7, and 8 were broken off. These three and number 9 are the upper front teeth. Dr. Kreller noted that even the teeth that were not fractured had significant blunt trauma, which would probably require root canal procedures. He also noted "significant - both intraorally in the mouth, through and through, and cutaneous lacerations of the lower lip, left face, around the intraorbital area, the left eye, and laceration repairs of the sides of the mouth. . . ." Kinchen had trismus, or limited opening of the jaw, because of the scar tissue.

Dr. Kreller performed a panoramic radiography of the entire facial area. Dr. Kreller evaluated Kinchen's condition and determined he would need several referrals to various specialists to repair his oral injures.

Kinchen was referred to Dr. Brian Clausen, a general dentist. Dr. Clausen prescribed vigorous massage therapy to break up the scar tissue, and prescribed opening and closing jaw exercises.

On September 22, 2008, Dr. Kreller surgically extracted teeth numbers 9, 24, 25, 26, 27, and 28 and performed an alveoloplasty in which the gum and bone are smoothed to prepare the jawbone to accept a prothesis.

Kinchen was also referred to Dr. George Franco, a general dentist, to further prepare for the procedures. Kinchen remained on a restricted soft diet during the process. In addition to the teeth injuries, his gum tissue or gingiva was very inflammed and sensitive. Following the surgery, Kinchen was placed on antibiotics (Keflex) and pain medication (Vicodin ES). He was given a temporary upper denture device to use until the restorative surgery. On January 5, 2009, Dr. Franco installed a permanent bridge to replace the missing upper tooth number 9.

On January 26, 2009, Dr. Kreller performed a synthetic graft of the bone in anticipation of Kinchen's receiving further orthotics, which he accomplished by tunneling under the gum tissue and placing the graft tissue inside to replace lost bone.

On December 8, 2009, Dr. Kreller placed five titanium dental implants to replace the roots of teeth numbers 24, 25, 26, 27, and 28, and grafted the buckled plate with puros, a bone grafting product. He also grafted the vertical height of the mandible to form a more solid foundation for the implant. The implants are required to remain in place for six months to allow the bone to grow into it before the tooth is replaced with a crown.

Dr. Kreller described Kinchen as one of his most compliant patients. Kinchen faithfully massaged the scar tissue, remained on a soft diet, and did the prescribed exercises to make the most of the treatment he was undergoing. Because of this compliance, Dr. Kreller did not have to perform the "Z-plasty" he anticipated having to do to surgically repair the scar tissue which was restricting

9

Kinchen's ability to fully open his mouth. On July 12, 2010, Dr. Kreller surgically installed the healing abutments to allow for the posts and teeth restorations.

Dr. Kreller opined that Kinchen's dental repairs will need ongoing followup for fractured ceramics on the crowns, bone loss, which could require grafting, and root canals to adjacent teeth which may have been injured but not severely enough to require immediate treatment. He estimates the life of the implants to be 15 years.

The total charges for Dr. Kreller's services was $17,354, and it is reasonable to predict that future dental procedures could total the same amount.[2]

### 9. Dr. Brett Chiasson

On July 31, 2008, Kinchen began treating with Dr. Brett Chiasson, an orthopedic surgeon, for his orthopedic injuries, including injuries to his ribs, back, left wrist, right knee, left ankle, fractured right ulna, and severe injuries to his hands.

On August 18, 2008, Dr. Chiasson found Kinchen to be improving. X-rays of his right forearm revealed a right ulnar shaft fracture, and left wrist x-rays revealed a small crack in the left ulnar styloid. Pre-patellar bursitis of his knee was noted, along with left ankle pain, which was improving. The pre-patellar bursitis and left ankle pain, was resolved within six to eight weeks, post accident. On September 2, 2008, an MRI of Kinchen's left wrist revealed abnormal effusion consistent with synovitis and tendonitis.

---

[2] This amount does not include charges for root canals to surrounding teeth because there is no evidence to establish the cost of those procedures.

On October 2, 2008, Kinchen's right forearm had improved, but left wrist pain and neck and lower back discomfort were still present. A steroid injection was administered to Kinchen's left wrist. Kinchen did not respond to a course of conservative treatments that included repeated corticosteroid injections. On December 23, 2008, because of Kinchen's continued complaints of pain, he was given another steroid injection, additional anti-inflammatory medication and an electromyography was ordered. On January 13, 2009, Kinchen continued to complain of left wrist pain, and surgery was discussed. On February 10, 2009, because of continued complaints of pain in his left wrist, an arthrosporic examination was scheduled. On March 4, 2009, Kinchen underwent arthroscopic surgery on his left wrist and areas of synovitis were shaved. Kinchen experienced temporary relief, but continues to have pain, numbness, and tingling in his left wrist.

On March 19, 2009, Kinchen was doing well, and was released to light or sedentary work. On his April 16, 2009, visit, Dr. Chiasson found "somewhat of a setback," with more pain then prior to surgery in Kinchen's left wrist, but his right arm fracture had healed. On June 25, 2009, there was significant improvement, and Kinchen was released to full duty.

Kinchen continues to receive periodic corticosteroid injections for pain in his left wrist. Dr. Chiasson testified that Kinchen will require an annual course of oral steroids for the remainder of his work life, and two to three steroid injections for the next ten years, at a cost of $450 annually, for an anticipated future medical cost of $5,000. He also repeated the arthrogram, which was normal, except for continuing synovitis and tendonitis of the left wrist. Dr. Chiasson suggests a repeat arthrosporic surgery on Kinchen's left wrist. This procedre currently costs $2,225, according to Dr. Chiasson's billing records. Dr. Chiasson testified that Kinchen's left wrist injury would

11

prevent him from working as a laborer, but that he could continue employment in the less strenuous job as a foreman ironworker.

**B.      Kinchen's Testimony**

Kinchen testified at trial his version of his accident and resulting injuries. He testified that he was unable to talk after the allision because his face was literally torn off. His lip was hanging below his chin. He spit out teeth, four or five from the bottom, and two or three on the top. He piloted the boat to the dock where he was taken ashore and attended to by paramedics, who took him by ambulance to Northshore Regional Medical Center. He was given a CAT scan, and transferred by ambulance to University Hospital in New Orleans, Louisiana where Dr. Matthew Wise performed emergency plastic surgery to suture Kinchen's face. Kinchen required 700 to 800 stitches in his face, and his broken nose was repaired. X-rays revealed a broken right arm. He continued to complain of abdominal pain. He was sent home without a diagnosis of the origin of the abdominal pain. A CAT scan of his abdomen was performed at Dr. Wise's office on July 6, 2008, but nobody was present to read it.

Because of continuing severe pain in his right side, he went to the emergency room at North Oaks Medical Center. Dr. Robert Kidd diagnosed a severed main artery to Kinchen's right kidney. Dr. Kidd performed surgery to install a stent in the artery. Kinchen remained hospitalized for two or three days, and was discharged with a catheter in place to drain the kidney.

Upon returning home, Kinchen continued to suffer chest pain from a collapsed lung, and compressed cartilage. He remained on bed rest, a liquid diet, and performed breathing treatments three times a day.

Four weeks later, Kinchen returned to North Oaks Medical Center were the stent was removed under general anesthetic. Because of the extremely high blood pressure, he was referred by Dr. Kidd to a nephrologist, Dr. Tasheen Rab. Kinchen was given prescriptions to control high blood pressure, which he will be on for the remainder of his life.

Kinchen consulted Dr. Nancy Mellin, an otolaryngologist (ENT), because of trouble breathing, sinus headaches, nasal dripping, congestion, and daily nosebleeds. Kinchen's perforated septum was surgically repaired under general anesthetic, but it did not correct the perforation.

Kinchen saw Dr. Daniel Trahant, who told Kinchen that the numbness in his face is permanent. Kinchen cannot feel kisses and has a "distorted" feeling in his eyebrow.

Dr. J. Skelly Kreller was the oral surgeon who oversaw the repairs to Kinchen's mouth and jaw. After four surgeries Kinchen's mouth was ready to receive the crowns implanted by Dr. George Franco, a general dentist. In the first surgery, Dr. Kreller extracted six of Kinchen's teeth and performed alveoloplasty in the area in the upper and lower jaw. In the second surgery, Dr. Kreller augmented the right anterior maxilla and the bone with a synthetic graft, at the location where Kinchen lost a tooth, to build up the bony material. In the third surgery, Dr. Kreller placed five dental implants in Kinchen's lower jaw and grafted the mandible with puros. In the fourth surgery, Dr. Kreller exposed the implants to allow Dr. Franco to place the crowns.

Kinchen consulted Dr. Brett Chiasson, an orthopedist. Dr. Chiasson treated Kinchen for injuries to his right knee, ankles, chest, and left wrist.

Kinchen returned to work for Boh Bros. as a safety man three months after the accident. He has since resumed his position of ironworker foreman. He is concerned that, if he loses his job at

Boh Bros., he would be unable to find another job. Dr. Chiasson opines that Kinchen cannot return to work as a journeyman ironworker due to his left wrist injury.

Kinchen testified that he suffered emotional pain as a result of the accident. He testified that his wife, Wendy Kinchen, could not look at him when she arrived at the hospital after the accident, and that her emotional reaction adversely affected him. Kinchen and his wife have been together for over fifteen years, and the first time she ever saw him cry was following the accident. He also testified that his children were not able to look at him for some time after the accident because they were "horrified" by the way he looked. Kinchen testified that he is concerned about the risk of heart attack and stroke. Wendy Kinchen testified at trial, and her testimony corroborated Kinchen's testimony regarding his medical treatment and mental state.

Based on Kinchen's testimony and that of his treating physicians, Kinchen is awarded $900,000 for past and future physical and mental pain and suffering, subject to a reduction of 50% for his percentage of fault.

## C.     Calculation of Special Damages

In Culver v. Slater Boat Co., 722 F.2d 114, 117 (5 th Cir. 1983) (Culver II), the United States Court of Appeals for the Fifth Circuit stated that the calculation of damages for personal injuries that will result in extended future disability involves four steps: (1) estimating the loss of work life resulting from the injury; (2) calculating the lost income stream; (3) computing the total damage; and, (4) discounting that amount to its present value. The court also stated that "the fact-finder should consider inflation in determining an appropriate damage award." Id. at 117. Also, the court stated that "fact-finders in this Circuit must adjust damage awards to account for inflation according

to the below-market discount rate method," and that parties can introduce expert opinions concerning the appropriate discount rate. Id. at 122.

In Monessen Sw. Ry. Co. v. Morgan, 108 S.Ct. 1837, 1845 (1988), the Supreme Court of the United States stated that "the present value calculation is to be made by the 'trier of fact,'" and that the trial judge cannot impose "rigid mathematical limitations" on the calculation. Id. at 1845 -46. Monessen does not preclude expert testimony calculating the discount rate in accordance with the guidelines set out in Culver II. Rather, Monessen acknowledges that there are appropriate methods for calculating the discount rate other than that announced in Culver II.

**D.     Future Medical Costs**[3]

According to the testimony of Kinchen's treating physicians, he will more probably than not need future medical care related to the injuries he sustained in the July 3, 20008, accident.

Dr. Rab testified that Kinchen will be required to take anti-hypertensive medications for the rest of his life, and attend bi-annual doctor's visits to monitor his blood pressure. Kinchen's medications currently cost $3,876 per year, and office visits with Dr. Rab currently cost $86 each.

Dr. Chiasson testified that Kinchen will need two or three steroid injections per year in his left wrist and a course of oral steroids over the next ten years. The current annual cost of three steroid injections is $450, and the current annual cost of the oral steroids is $50. Dr. Chiasson also testified that Kinchen will need another surgery on his left wrist. The current cost of the surgery as reflected in Dr. Chiasson's billing statement is $2,225.

---

[3] Kinchen has not offered any proof to support a claim for lost wages. Therefore, it will not be considered. Also, Kinchen's medical bills reflect that no further amounts are due. Therefore, Kinchen is not entitled to an award for past medical costs.

Dr. Kreller testified that Kinchen will need future dental work. He testified that a reasonable cost for future dental work would be the total amount of his bills to date, which is $17,354.

According to the United Stats Department of Health and Human Services Statistics, Kinchen's life expectancy is 46.3 years. The lowest growth rate in the Bureau of Labor Statistics Consumer Price Index for medical costs for the period 1996 to 2011 is 4.09%, and the average Bureau of Labor Statistics Consumer Price Index growth rate from May 1996 to May 2011 was 2.47%. This demonstrates that medical costs historically have grown at a faster rate than general consumer prices. It is reasonable to assume that these trends will continue. Therefore, this court will apply a growth rate of 4.09% to medical costs. Also, this court will apply a discount rate 2.97% which is the average interest rate for three-month Treasury Bills from May 1996 to May 2011, adjusted for taxes. This discount rate is reasonable because it takes into account a reasonably safe investment with a reasonable rate of return.[4]

Using this formula, the present value of Kinchen's life-long anti-hypertensive medications is $228,054, and the present value of his bi-annual doctor's visits to monitor his blood pressure is $10,394. The present value of the steroid injections and oral steroids to treat Kinchen's left wrist pain over the next ten years is $4,928 and $546, respectively. Dr. Chaisson testified that Kinchen will need another wrist surgery. It is calculated at five years in the future because this is half of the time during which Dr. Chaisson testified that Kinchen would need treatment for his left wrist. The

---

[4] The formula for obtaining a present value using an inflation rate of 4.09% and a discount rate of 2.97% is:

Present value = $\sum ((D_0 * 1.0409^t)/1.0297^t)$, where t is the amount of time in the future, and $D_0$ is the current annual cost.

present value of the wrist surgery placed at five years in the future is $2,349. Because it is impossible to predict when Kinchen will need future dental work, and Dr. Kreller testified that the dental implants last approximately 15 years or more, the lump some of future dental treatment is placed at 20 years in the future, and the present value thereof is $21,546.

Therefore, the total present value of Kinchen's future medical costs is $267,817, and Kinchen is awarded that amount for future medical costs, subject to a reduction for his 50% fault.

### E.     Interest on Past Damages

In <u>Williams v. Reading & Bates Drilling Co.</u>, 750 F.2d 487, 491 (5th Cir. 1985), the court held that a court may award prejudgment interest when a Jones Act claim is brought under the court's admiralty jurisdiction. "[I]n maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." <u>Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.</u>, 71 F.3d 198, 204 (5th Cir. 1995). However, "[p]eculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by the plaintiff." <u>Reeland Tubing, Inc. v. M/V CHAD G</u>, 794 F.2d 1026, 1028 (5th Cir. 1986).

Awarding interest would be inequitable in this matter because Boh Bros. paid workers' compensation benefits to Kinchen from the date of the accident based on the presumption that he was not a Jones Act seaman. This court declines to penalize Boh Bros. for asserting that position pending the appeal of this court's ruling on seaman status.

## CONCLUSION

On the basis of the above Findings of Fact and Conclusions of Law, this court finds that Kinchen is entitled to recover the following damages from Boh Bros.:

(1) Past, present, and future physical and mental pain and suffering and loss of enjoyment of life:
Nine hundred thousand dollars ($900,000), subject to a reduction for his 50% fault;

(2) Future medical expenses:
Two hundred sixty-seven thousand eight hundred seventeen dollars ($267,817),subject to a reduction for his 50% fault.

New Orleans, Louisiana, this  29th  day of September, 2011.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**