UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JASON GRAB

VERSUS

TRAYLOR BROS., INC, KIEWET
SOUTHERN CO., & MASSMAN
CONSTRUCTION CO., a Joint
Venture, ET AL.

CIVIL ACTION

NO: 09-3439 C/W 09-
4128, 09-7387, 10-838

SECTION: "S" (1)

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Lary Scott Abshire, filed suit against Boh Bros. Construction Co., L.L.C. ("Boh Bros.") and Traylor Bros., Inc., Kiewet Southern Co., & Massman Construction Co., A Joint Venture (the "Joint Venture") alleging that the defendants are liable for a July 3, 2008, boating accident in which he was injured. Liability has been determined in the first part of the bifurcated trial. This part of the trial was to determine Abshire's damages.

Boh Bros. and the Joint Venture were contractors involved in building the new I-10 Twin Span bridge over Lake Pontchartrain connecting New Orleans, Louisiana with Slidell, Louisiana on behalf of the Louisiana Department of Transportation and Development ("DOTD"). The DOTD was the owner of the project. Boh Bros. built the approaches to the bridge. The Joint Venture built the high rise, or "hump," portion of the bridge. As part of its construction methodology, the Joint Venture erected four survey towers in Lake Pontchartrain near the bridge project identified as TKM-10, TKM-11, TKM-13 and TKM14.

On July 3, 2008, Abshire, an ironworker, who was employed by Boh Bros. to work on the bridge, was injured when the crew boat in which he was riding from the work site to shore at the end of the his first day of work allided with the TKM-14 survey tower.  At the time of the accident, another Boh Bros. iron worker, Jacob Kinchen, who was not a licensed captain, was operating the crew boat.

After a trial regarding liability and Abshire's seaman status, this court found that Kinchen and Boh Bros. were each 50% at fault in causing the accident,[1] and no fault was attributed to the Joint Venture or Abshire.  This court also found that Abshire was a Jones Act seaman.  Abshire contributed to the function of and accomplishment of the mission of the BIG MAC, the vessel from which the Boh Bros. ironworkers worked on constructing the bridge, and he had a substantial connection to the BIG MAC in duration and nature.[2] See  Chandris, Inc. v. Latsis, 115 S.Ct. 2172, 2189-90 (1995).  A bench trial regarding Abshire's damages was held on July 25 and 26, 2011.

A.      **Abshire's Injuries**

1.      **Physical Injuries**

On the date of the accident, Abshire was 29 years old.  When the crew boat allied with the TKM-14, Abshire, who was sitting on a bench in the cabin facing the starboard side of the vessel, was thrown forward and his left side hit the wall of the vessel's cabin, seriously injuring him.

---

[1] Because Kinchen was an employee of Boh Bros., his fault is attributable to Boh Bros.  Because no fault is attributable to Abshire, Boh Bros. is 100% responsible for Abshire's injuries.

[2]  Abshire filed the suit on himself and his minor daughter, Kinley Lyric-Grace Abshire.  Because loss of consortium is not recoverable in general maritime causes of action for the personal injury of a Jones Act seaman, the claims brought on behalf of Abshire's daughter are DISMISSED.

### a.  Slidell Memorial Hospital

After the accident, Abshire was transported by ambulance to Slidell Memorial Hospital, where he was diagnosed with left sacral fractures, left pelvis fractures, and thoracic lumbar spine injuries at the T12 level.  Abshire also had a partially collapsed lung, crushed testicles, and bruises and abrasions.  Abshire was stabilized at Slidell Memorial Hospital, and then transferred by ambulance to Our Lady of the Lake Hospital in Baton Rouge, Louisiana.

### b.  Our Lady of the Lake Hospital

At Our Lady of the Lake Hospital, Abshire underwent a series of diagnostic tests, was fitted for a plastic clamshell back brace, and was admitted to the intensive care unit where he was prescribed Decadron and ordered to maintain bed rest until he could be scheduled for surgery.

On July 9, 2008, Abshire underwent surgery to repair his fractured sacrum and pelvis.  Dr. Craig Greene, an orthopedist and trauma surgeon, performed percutaneous insertion of a left iliosacral screw using orthogonal fluoroscopy; closed manipulation of the multiple fractures of the anterior pelvic ring; and the application of a uniplaner external fixator to the supracetublar region.  Dr. Greene explained that the pelvis is a ring and does not break in one place, but in multiple places. He stated that Abshire's pelvis was unstable, which meant that when he tried to roll around in the bed it was very painful because the edges of the bones were rubbing against each other.  Dr. Greene testified that the screws and external fixator held the pelvis in position while the bone healed.  After the surgery, an external fixation device spanned Abshire's hips on the outside of his body. On the day after the surgery, Abshire was allowed out of bed and into a chair.  His staples were removed

in two weeks.  After six weeks, he was allowed some weight bearing, and he was taken back into surgery where the external fixator was removed.

During his hospital stay, Abshire was seen by Dr. Glenn Anderson, a neurosurgeon, every day. Abshire was released from Our Lady of the Lake Hospital on July 15, 2008.

### c. Northshore Regional Medical Center

Abshire was transferred to Northshore Regional Medical Center, in Slidell, Louisiana, where he was admitted for intensive rehabilitation for ten days.  The rehabilitation consisted of physical and occupational therapy during which Abshire was assisted and trained with bowel and bladder management, skin integrity, and fall precautions.  He was prescribed Lortab 7.5 milligrams twice a day for pain.

While he was at Northshore Regional Medical Center, Abshire developed a methicillin resistant staphylococcus aureus ("MRSA") infection around one of the external fixator sites. He was treated by an infectious disease specialist, was quarantined, and received three doses of intravenous antibiotics, followed by a series of oral antibiotics.

While at Northshore Regional Medical Center, Abshire's mobility was limited to 200 feet of ambulation with a rolling walker, and he was able to propel his wheelchair approximately 200 feet.  He could feed and groom himself, but needed assistance with bathing and using the toilet.

On July 25, 2008, Abshire was released from Northshore Regional Medical Center and went home.  From July 30, 2008 to January 12, 2009, Abshire attended outpatient therapy at Northshore Regional Medical Center three times per week.

4

### d.     Dr. Craig Greene

Abshire saw Dr. Greene nine times after he was released from the hospital, the last visit being on August 4, 2009. On August 11, 2008, Abshire complained to Dr. Greene of pain around his pin site. Dr. Greene noted that Abshire's left foot was red, and an x-ray of Abshire's pelvis revealed interval bony healing of his anterior pelvic ring.  On August 20, 2008, Dr. Greene surgically removed the external fixator, under general anesthetic.  On September 19, 2008, Abshire complained to Dr. Greene of a dull ache in his hip and groin.  Dr. Greene again noted that Abshire's left foot was red and swollen.  Dr. Greene suspected that Abshire had developed reflex sympathetic dystrophy, which is the over activation of the nerve feedback cycle in an extremity causing the patient a disproportionate amount of pain.  Dr. Greene referred Abshire to Dr. Shawn Dunn, a pain management specialist.  Dr. Greene released Abshire from his care on August 4, 2009, and referred him to Dr. Brian Murphy, a neurologist, for an evaluation of the neuropathy that Abshire was experiencing in his left foot and leg.  Dr. Greene opined that Abshire may be able to perform only a medium demand workload in the future. Dr. Greene opined that Abshire will likely experience pain for the rest of his life, but probably will not need another pelvic surgery or a hip replacement.

### e.     Dr. Glenn Anderson

Abshire saw Dr. Anderson three times after he was released from the hospital regarding his thoracic and lumbar injuries at the T12 level.  Dr. Anderson testified that Abshire sustained a T-12 vertebral body fracture with mild compression, a transverse process fracture at a lower lumber vertebrae left of L6-S1, a left lateral vertebral body fracture, pedicle fracture, a facet fracture at the L5-S1 level, and a fracture of the sacral ala.  Dr. Anderson noted angulation, or bending, related to

the T12 fracture.  Abshire elected to continue wearing the clamshell back brace for three to four months,[3] rather than proceeding with surgical intervention for the angulation.  Dr. Anderson testified that Abshire's chronic compression deformity at T12 has increased from 25% to 30%, and that it is typical for this type of deformity to increase over time with an accompanying increase the patient's pain level.  Abshire has also developed bone spurs, which need to be monitored.  Dr. Anderson testified that the L5-S1 herniations, the L6 fracture, the sacroiliac joint fracture, the sacrum fracture, and the T12 fracture could all be pain generators for the lower back.  Dr. Anderson testified that Abshire will likely have chronic back pain requiring treatment for the remainder of his life.  His restrictions include avoiding lifting over 30 or 40 pounds, twisting or bending, climbing stairs or ladders, or working at heights.

    **f.  Dr. Shawn Dunn**

   On a referral by Dr. Anderson, Abshire began treatment with Dr. Shawn Dunn for pain management on November 10, 2008.  Dr. Dunn diagnosed Abshire with complex regional pain syndrome in his lower left leg, with muscle wasting and weakness in that leg.  Dr. Dunn testified that the condition is permanent, and Abshire may experience complications such as deep venous thrombosis, susceptibility to infections, susceptibility to trips and falls, arthritis at an early age, muscle atrophy, and joint infection.  Dr. Dunn testified that Abshire's condition is worsening.  Dr. Dunn has prescribed Neurontin, Pamelor, vitamin C, Ultram, and Lortab to Abshire.  Dr. Dunn testified that Abshire will require four pain management doctor's visits per year to review his

---

   [3]  Dr. Anderson described the brace as "a big plastic molded brace . . . that will extend from the back of the neck . . . covering your chest and all down your abdomen down to your pelvic bone."

medications and renew his prescriptions, and that he will require life long medications, intermittent physical therapy, and perhaps nerve blocks. On November 19, 2008, Dr. Dunn injected Abshire's sacroiliac joint with Marcaine and a steroid to relieve pain from of sacroiliac joint dysfunction. Dr. Dunn noted coolness and clamminess to Abshire's lower leg, an indication of complex regional pain syndrome.

Dr. Dunn performed a lumbar sympathetic block on January 15, 2009, January 22, 2009, and January 28, 2009. Dr. Dunn referred Abshire to Dr. F. Cal Robinson, a neuropsychologist, for anxiety.

On March 12, 2009, Abshire reported to Dr. Dunn that the lumbar sympathetic blocks had helped. Dr. Dunn prescribed tricyclics to address Abshire's complaints of sleeplessness. Abshire received lumbar sympathetic nerve blocks on July 11, 2009, and again on September 9, 2009. Abshire was prescribed Voltaren gel for topical application to relieve back pain.

At a followup visit with the nurse practitioner on October 28, 2009, Abshire reported brief relief from the sympathetic block, but continuing sharp pain, and a shocking sensation in his mid-leg, radiating downward. Because the injections were not helping, Dr. Dunn suggested a spinal cord stimulator. Dr. Dunn describes the procedure:

> First there's a trial and then if the trial is successful then he proceeds to surgery. Basically the trial is an outpatient type of procedure. The patient comes in, we start an IV, we bring them to fluoroscopy or X-ray suite, sterilely we take a needle and insert it in the epidural space or the space on the back part of the spine where the nerves come out. We pass a wire up to about the mid thoracic area, that's where the nerves come out pretty much for the back and lower extremities and we turn the wire on, the patients will typically state that they have a pleasant sensation, buzzing, numb, tingling in the

> affected area that we want.  We'll suture that down, put a Band-Aid or dressing over it and we'll send them home.  They typically try it anywhere from four days to a week.  We pull the wire out in Clinic. If successful we'll proceed with implantation.
>
> Implantation [] done as surgery would be done where the wire is placed permanently beneath the bones of the spine.  The wire runs from there typically into the buttock area.  We put a generator or spinal cord generator underneath the skin and its sutured down.

The risks of the implantation include bleeding, infection, allergic reaction, migration or moving of the wires, and breakage of the wires which could cause paralysis.  Restrictions after surgery include no bending, twisting, lifting over five pounds for one month, 10 pounds for one to three months, and 10 to 20 pounds for three to six months.  The reason for the restrictions is to prevent a wire from migrating away from the targeted area, which would require additional surgery to amend.  Dr. Dunn hopes the device would last seven to ten years.  It would require annual maintenance and Dr. Dunn would perform the annual interrogation of the stimulator and reprogramming if necessary.  Ordinarily, wires do not need to be replaced, but if bending or twisting causes a break, the wires would have to be surgically replaced.  Dr. Dunn categorized the risk of a break as of "reasonable concern."

On the December 3, 2009, visit with Dr. Dunn, Abshire reported increased pain in his back and leg, with foot spasms at night, and swelling and chronic coldness in his left leg.  Dr. Dunn attributed the spasms to Abshire's complex regional pain syndrome.  On the date of that visit, Abshire was taking two or three Lortabs a day for pain, and Baclofen, a muscle relaxant, for the spasms.  Abshire reported increased symptomology in cold weather, a common occurrence in complex regional pain syndrome.

8

At his June 4, 2010, visit to Dr. Dunn, Abshire reported increased pain in his leg, higher than before, behind his hamstring area.  Dr. Dunn attributes the change in site to "mirror spreading," a condition in which the complex regional pain syndrome pain migrates to other areas.

At his November 17, 2010, appointment, Abshire's left leg was markedly colder than the right, and was more "purplish and erythematous than the right."  Dr. Dunn increased Abshire's Lortab from 7.5 milligrams to 10 milligrams.  A transdermal Butran Patch was prescribed.

Abshire was referred to Dr. John F. Bolter, a neuropsychologist, to rule out underlying malingering or other psychotic problems in anticipation of his undergoing a spinal cord stimulator trial.  Dr. Bolter determined that Abshire was an appropriate candidate for the procedure.

On February 21, 2011, Abshire underwent a trial with a spinal cord simulator. At his February 25, 2011, visit with Dr. Dunn, Abshire reported a 75% decrease in the pain in his left leg, although not much benefit in his back or foot.  The trial spinal cord stimulator helped Abshire's pain, but not his functionality.  Abshire continues to evaluate whether to have the permanent spinal cord stimulator, and at the time of trial was leaning toward having it installed.  Dr. Anderson suggested that a myelogram of the thoracic and lumber spine be performed before placement of a spinal cord stimulator.

Dr. Dunn posits that Abshire will be required to see him three to four times a year for the rest of his life to be monitored for the effectiveness of the drugs he is taking as well as to insure he is not having adverse reactions thereto.  Dr. Dunn recommends ongoing physical therapy, regular exercise, and aqua therapy.  He does not think Abshire will be able to return to work.

g.     **Dr. Brian Murphy**

On September 21, 2009, Abshire saw Dr. Brian Murphy, a neurologist.  Abshire complained

of chronic left leg pain, weakness, and numbness.  Dr. Murphy performed an electromyography on

Abshire, which confirmed that he had severe chronic left lumbosacral plexopathy.  Dr. Murphy

testified that Abshire had an axonal nerve injury, which is an injury to the nerve center, that caused

Abshire to develop chronic left lumbosacral plexopathy. Dr. Murphy describes the neuropathic pain

Abshire is experiencing as stinging, burning, and shooting pain which is chronic and constant.  Dr.

Murphy testified that Abshire's left leg weakness is severe and permanent and that he will have little

to no further nerve regeneration.   Dr. Murphy opines that Abshire is in for a very prolonged,

incomplete recovery.  He further opined that physical therapy is the only treatment, and may be only

somewhat helpful, primarily to prevent further muscle loss or atrophy.  Dr. Murphy testified that

Abshire will have difficulty maintaining employment as a manual laborer.  Dr. Murphy confirmed

that Abshire has developed complex regional pain syndrome.

h.     **Dr. Erich O. Richter**

On June 2, 2011 and June 30, 2011, Abshire saw Dr. Erich O. Richter, a neurosurgeon,

regarding a the permanent implantation of a spinal cord stimulator.  Dr. Richter noted that Abshire

had decreased muscle bulk in the left leg, spasticity, and some weakness related to pain.  Dr. Richter

ordered MRI's of Abshire's lumbar spine, which showed that Abshire has broad based right

paracentral disc protrusion, minimal annular radial tear at L5-S1, and non- chronic compression

fracture at T12.  Dr. Richter testified that Abshire's condition will most likely get worse and that

Abshire is at risk for developing arthritis type degeneration.   Dr. Richter also confirmed that

Abshire has lumbosacral plexus disorder that is contributing to his neuropathic pain.  Dr. Richter opined that Abshire sustained a peripheral nerve injury to the network of nerves that go to his lower extremity which has caused him to develop complex regional pain syndrome.  Dr. Richter testified that the disease has a tendency to worsen over time, and may spread to other areas of the body not originally involved.

Dr. Richter recommended that Abshire undergo another spinal cord stimulator trial because the first trial was only partially successful and did not relieve Abshire's foot pain; and a different electrode configuration might be more effective.  He testified that if it is successful, he would recommend that Abshire get a permanent spinal cord stimulator.  He testified that the risks associated with a permanent spinal cord stimulator include paralysis, higher risk of electrocution, and avoidance of certain electric devices.  Also, Abshire will need to have the batteries surgically replaced approximately every 5 to 10 years and two full revisions of the spinal cord stimulator implantations over his lifetime.  Because of his diagnosis of neuropathic pain syndrome, surgical treatment, without accompanying psychiatric care, is medically inappropriate.

Dr. Richter testified that Abshire would need preoperative tests, including a CT scan and myelogram of his cervical, thoracic, and lumbar spine, a cervical MRI, a examination by a urologist, and a seizure disorder workup.

Dr. Richter also suggested that if the stimulator is not successful, Abshire could have morphine or a similar narcotic administered through an intrathecal drip dispensing pump. The downside of that alternative includes, in addition to addiction, having to surgically refill the pump twice a year, infections, breakage, and replacement every five years.

11

Dr. Richter notes that if the spinal cord stimulator implantation is successful in reducing Abshire's pain, he may be able to reduce his medications, but Dr. Richter cannot predict whether that will happen.

Overall, Dr. Richter said the injuries are permanent, and that no corrective procedures are available. Only symptomatic management of Abshire's condition, including physical therapy and perhaps physiotherapy, is available.

### 2.        Mental and Emotional Injuries

In October 2008, Abshire began treatment with a clinical and medical psychologist, Erin Skaff, Psy. D., MPH, regarding the mental and emotional issues related to the July 3, 2008, accident. From October 30, 2008 through May 24, 2011, Abshire had 44 sessions with Dr. Skaff.[4]

Dr. Skaff testified that, when she began treating Abshire, she noted that he appeared dysphoric and struggled with anxiety, which included depression, panic attacks, fears, worry, sinking confidence, replays of the accident, concerns about coping with the pain, demoralization, inability to relax, sleep problems, and intrusive thoughts about the accident and his injuries. Abshire was having difficulties adjusting to his disabilities and the trauma he experienced. Dr. Skaff diagnosed acute post traumatic stress disorder. She opined that the accident and resulting injury was the stressor causing these conditions.

Dr. Skaff testified that Abshire "did make improvement" from the time of his first appointment, but continues "to struggle with adjusting to a different kind of life . . . not being a

---

[4] Abshire also saw Aaron Wolfson, Ph.D., CRC, CLCP, a rehabilitation psychologist, a few times when Dr. Skaff was on maternity leave.

construction type worker anymore and trying to do other things with himself." He has had the expected peaks and valleys in his progress. He also gets frustrated with his progress, and does not have as much self confidence physically and emotionally. Dr. Skaff has additionally diagnosed adjustment disorder involving how he is coping with changes in his life. She opined that he can do well if given proper medical, psychological, educational, and vocational support. He is motivated and "he would like to be doing a lot and could be capable of a lot but . . . his pain and his instability given that everything he's doing right now is new to him has been the challenge that . . . as time moves forward he'll do better as long as he's helped, coached."

Dr. Skaff testified that Abshire will have recurring issues when he is under stress, such as anxiety, depression, and helplessness about the future. She testified that he will continue to need psychotherapy sessions once every one to three months, depending on what is happening in his life. Dr. Skaff also testified that Abshire will need couples counseling to help a potential partner understand Abshire's injuries and disabilities. He continues to have a hard time parenting his child because of his physical limitations. Abshire attempted to go back to school and enrolled twice, but was unable to attend more than a month or two because of becoming overwhelmed as he continued rehabilitating both emotionally and physically. Dr. Skaff states that the post traumatic stress disorder is better under control at this point, but not completely under control. She speculates that Abshire should see her every month for two years, and two to four times per year thereafter. Her charge is $178 per hour, or $283 for a 90 minute session.

**B.      Abshire's Testimony**

Abshire testified at trial that he is currently 32 years old, is not married, and has one child, a two year old girl named Kinley Lyric-Grace Abshire.  He shares custody of his daughter with her mother, and cares for her four or five days per week.

**1.      The July 3, 2008, Accident**

Abshire testified that at the time of the accident he was an iron worker employed by Boh Bros. to work on the I-10 Twin Span bridge project.  When the vessel hit the TKM-14, Abshire's left torso hit the side of the vessel.  After the impact, Abshire was lying on the floor of the vessel in a pool of Kinchen's blood, and could not get up.  Abshire testified that he thought he was paralyzed.  He saw Kinchen's face, which was partially torn off, and testified that it was "like a horror movie" because he could see Kinchen's teeth and the muscles on the side of Kinchen's face. Abshire did not have a recollection of the time that elapsed between the impact and reaching the shore, but it felt like an hour.

Once he reached the shore, Abshire was placed on a stretcher and taken by ambulance to Slidell Memorial Hospital with Jason Grab, one of the other Boh Bros. iron workers who was injured in the accident.  Abshire testified that he was in extreme pain during the ride, and that one of the paramedics sat on him while she was caring for Grab.

**2.      Slidell Memorial Hospital**

Abshire testified that his recollection of his time at Slidell Memorial Hospital is unclear.  He remembered asking someone to call his mother, that he had a CAT scan and that he needed blood. He testified that he asked the doctors if he was going to die and that it was the worst pain he had

ever experienced.  Abshire testified that he was worried because he had just bought a house and he knew that his daughter was going to be born in a few months.

Abshire testified that he was taken by ambulance from Slidell Memorial Hospital to Our Lady of the Lake Hospital in Baton Rouge, Louisiana.  He testified that the ride was extremely painful and that he cried because of the pain during the ride.

### 3.     Our Lady of the Lake Hospital

Abshire testified that he stayed at Our Lady of the Lake Hospital for ten days.  He testified that he saw several doctors, and had surgery to repair his pelvic fracture.  He was not able to stand or walk during this hospital stay.  He testified that he was humiliated because he was a "tough guy" before the accident and after the accident he could not walk, stand, bathe, or use the bathroom without help.  He testified that he was in a lot of pain.  He had bruises on the left side of his body, and his crushed testicles were black. Abshire was released from Our Lady of the Lake Hospital on July 15, 2008.

### 4.     Northshore Regional Medical Center

Abshire was transported by ambulance to Northshore Regional Medical Center for in-patient rehabilitation .  He testified that the ambulance ride was horrible because the driver hit a lot of bumps, and he felt like he was being thrown in the air and slammed back on the bed.

At Northshore Regional Medical Center, he underwent occupational and physical therapy. Abshire testified that he had to wear the clamshell back brace when he was not lying down.  He did leg lifts in the wheel chair, walked across the parallel bars, and walked with a walker.  Abshire testified that rehabilitation was painful.  He testified that, because the therapists preferred that he

stay in his wheel chair, he stayed in it as long as possible, but when it was too painful, he would lie

in bed.  He had the external fixator installed while in rehabilitation, and it became infected with

MRSA.  Thereafter, the medical staff and his visitors were required to wear masks and gowns.  It

made him feel more alone because his loved ones could not touch him.  He was released to go home

on July 25, 2008.

### 5.        Out Patient Care

At Abshire's home, a home healthcare nurse dressed the fixators and monitored the swelling

in his leg.  He continued to have pain in his groin and back. He had pain in his spine that radiated

to his legs when he twisted and moved. Abshire also testified that his spine healed crooked, and he

elected not to have surgery to straighten it, because he was told surgery would not have reduced his

pain.  However, he acknowledged that his condition was improving because he could walk with the

aid of a walker.

Abshire testified that he attended out-patient physical therapy three days per week from July

30, 2008 to January 12, 2009.  At physical therapy, he did leg lifts, walked with a walker, and used

a stationary bicycle.

### a.        Seizure

On August 19, 2008, Abshire experienced a grand mal seizure in Dr. Anderson's waiting

room.  He testified that he was anxious, felt thirsty, became lightheaded, and passed out.  He was

sent to the emergency room at Our Lady of the Lake Hospital, and had x-rays.[5]

---

[5]    Dr. Richter connects this seizure to the accident because severe trauma puts one at increased risk of seizure disorder.

16

### b.    External Fixator Removal

On August 20, 2008, Abshire had the external fixators removed in an out-patient surgery under general anesthetic at Dr. Greene's office.  He testified that at this point his left foot and his pelvis hurt.  Abshire stated that it felt like his left foot was being squeezed when a sheet touched it, and that he had a pins and needles sensation from his left knee to his left foot when something touched it.  He still experiences shocking pain from his left foot to his left ankle that spreads to the back of his left leg, which is getting worse.

### c.    Dr. Brian Murphy

On September 21, 2009, Abshire saw Dr. Murphy who told him that his nerve damage was severe and permanent, some nerves were almost completely severed, and that there would be little to no further nerve regeneration.

### d.    Dr. Shawn Dunn

Abshire testified that he sees Dr. Dunn for pain management every three months.  At each appointment, Dr. Dunn checks Abshire's pain levels and adjusts his medications.  Abshire testified that Dr. Dunn has prescribed neurontin, hydrocodone, effexor, tramadol, and protonix.  Anshire testified that he received three or four sympathetic nerve blocks; that the first shot provided some relief, especially with the coldness in his leg; that his leg is cold; he has pain in his foot, leg, groin, and back; his foot has a pins and needles feeling; he experiences spasms in his foot; he has cramps in his foot, calf, and hamstring; he has problems urinating; and problems climaxing during sex and has to stop because of his pain, which is embarrassing and "hurts his manhood."

17

### e.       Spinal Cord Stimulator

Abshire testified that he had a spinal cord stimulator trial.   He testified that the spinal cord stimulator trial was "terrible."  It helped with the pain in his hamstring, but he had sharp pain in his back, and pain in his right leg that would cause the muscles to go into spasm and did not help the pain in his foot.

Abshire testified that he consulted with Dr. Richter about the implantation of a permanent spinal cord stimulator.  Dr. Richter suggested another trial using different electrodes to try to reach the nerves to Abshire's foot. Abshire testified that he is willing to undergo another trial because his options are limited to pain medications, a morphine pump, or a spinal cord stimulator. Abshire testified that if the second trial is successful, he will have a permanent spinal cord stimulator installed.  Because of the August 19, 2008, seizure, Dr. Richter recommended that Abshire have a seizure disorder work up prior to the spinal cord stimulator surgery.

### f.       Physical Therapy - Functional Capacity Evaluations and Work Hardening

On March 31, 2009, Abshire had a functional capacity evaluation at Peak Performance Physical Therapy.  He was asked to walk and crawl on the floor, given a grip test, and lifted weighted boxes.  He "gave 120%," and had to lie down for three days after the two hours of work because of severely increased pain.

He attended 22 sessions of a work hardening program at Audubon Physical Therapy from May 29, 2009, to August 10, 2009.  He performed leg lifts with light weights, walked on a treadmill, used a hand bike, lifted upper body weights, and walked with weighted boxes.  His pain got worse

during the workouts, and the coldness in his foot increased and moved further up his leg.  He could not complete the workouts because his leg was cold and the pins and needles pain was extreme.  His back, groin, foot, and leg were still painful after the completion of the program.

On August 13, 2009, Abshire had a functional capacity evaluation at Baudry Physical Therapy.  The routine was programmed to have Abshire perform at a level that would not impact his functionality after the evaluation.  He walked, performed a grip strength test, carried a weighted bucket, and sat for an extended period.  After the evaluation, he sat in his chair for the remainder of the day, but he was back to his normal functioning the next day.

<b>g.      Education and Experience</b>

Abshire testified that he has a ninth grade education, and obtained a general equivalency diploma.  He testified that he was a journeyman ironworker, and had been a foreman in the past. As a connector, his job was to fly the iron up the structure, and to connect it.  Abshire would climb up a column, secure the bolts, walk across the structure, and wait for the next column.  Abshire has always performed manual labor during his working life.  He testified that he always had a job lined up when one job would end, and that his hope was to continue his work with Boh Bros. after the I-10 Twin Span bridge project was completed.

Abshire has attended Delgado Community College twice since the accident.  The first time, he attempted a business program, and the second time, he attempted a music program.  He could not complete the course work because it was overwhelming having to keep up with his house and daughter, and deal with his pain and depression.  His goal was to be able to work in the business aspect of the music industry.  He attempted to start a business booking bands at clubs, but it was not

19

successful.  Abshire testified that he hopes to go back to work, and has tried unsuccessfully to find work. He testified that he applied for jobs that were suggested by Nancy Favalora, a vocational rehabilitation specialist.

### h.  Daily Living

Abshire testified that prior to the accident he enjoyed weight lifting, fishing, knee boarding, and playing the drums.  He can no longer engage in any of those hobbies, except for playing the drums.  He cannot mow his lawn, but can perform housekeeping tasks a little at a time. Abshire has difficulty caring for his daughter because he cannot pick her up, and cannot run with her. He has trouble sleeping because has flashbacks of the piling coming at him and Kinchen's mangled face. He testified that the pain is getting worse, radiating from his foot to his hip, and he has developed an ulcer.

### i.  Mental Health Treatment

Abshire testified that he is being treated by Dr. Skaff, a psychologist.  She has diagnosed post traumatic stress disorder and adjustment disorder.  He sees her approximately once every two weeks. She helps Abshire to see things differently, and explains why he feels certain emotions.  He testified that he would like to continue treatment with Dr. Skaff because it improves his outlook.

Based on Abshire's testimony and that of his treating physicians, Abshire is awarded $1,250,000 for past and future physical pain and suffering, and $75,000 for past and future mental pain and suffering, which includes Abshire's post traumatic stress syndrome and sexual dysfunction.

**C.      Calculation of Special Damages**[6]

In Culver v. Slater Boat Co., 722 F.2d 114, 117 (5 th Cir. 1983) (Culver II), the United States Court of Appeals for the Fifth Circuit stated that the calculation of damages for personal injuries that will result in extended future disability involves four steps: (1) estimating the loss of work life resulting from the injury; (2) calculating the lost income stream; (3) computing the total damage; and, (4) discounting that amount to its present value.  The court also stated that "the fact-finder should consider inflation in determining an appropriate damage award." Id. at 117.  Also, the court stated that "fact-finders in this Circuit must adjust damage awards to account for inflation according to the below-market discount rate method," and that parties can introduce expert opinions concerning the appropriate discount rate. Id. at 122.

In Monessen Sw. Ry. Co. v. Morgan, 108 S.Ct. 1837, 1845 (1988), the Supreme Court of the United States stated that "the present value calculation is to be made by the 'trier of fact,'" and that the trial judge cannot impose "rigid mathematical limitations" on the calculation. Id. at 1845 -46. Monessen does not preclude expert testimony calculating the discount rate in accordance with the guidelines set out in Culver II.  Rather, Monessen acknowledges that there are appropriate methods for calculating the discount rate other than that announced in Culver II.

**1.      Lost Wages**

John C. Gardner, Ph.D., an accounting professor at the University of New Orleans, testified as an expert for Abshire regarding Abshire's lost wages and fringe benefits.  J. Stuart Wood, Ph.D.,

---

[6] In his post trial memorandum, Abshire argues for an award for lost life expectancy.  Abshire did not plead a claim for lost life expectancy in his complaint.  Therefore, it will not be considered.

an economics professor at Loyola University, testified as an expert for Boh Bros. regarding Abshire's lost wages and fringe benefits. Each economic expert testified regarding his calculations of Abshire's lost wages assuming total disability, and his calculations assuming that Abshire could perform sedentary work. Because Abshire's doctors uniformly testified that Abshire is physically incapable of being competitive in the work force, this court will award lost wages based on total disability.

Gardner testified that the present value of Abshire's lost wages from the date of the accident is $1,511,622, and the present value of Abshire's lost fringe benefits, including health and welfare benefits, defined investment contributions, and pension fund contributions, from the date of the accident is $616,992. Gardner began with an annual lost income of $42,820. At the time of the accident, Abshire was earning $20.41 per hour. Gardner used this number to determine an annual salary, and added a conservative estimate of $2,000 annually of overtime. Gardner assumed that Abshire's career would progress forward, and he would be promoted to foreman on January 1, 2010, with a raise of $0.75 per hour. Gardner deducted 11% for taxes, and applied a 3.78% annual growth rate, which was obtained from the Social Security Administration averages wages for United States workers from 1995 to 2010. Gardner determined that Abshire's work life expectancy is 31.27 years from the valuation date of June 30, 2011. Gardner used recent surveys that show that American workers are retiring later than in the past. Gardner then applied a discount rate of 2.47%, which represents the average rate of return on United States Treasury Bills for 15 years, adjusted for taxes.

To calculate Abshire's lost fringe benefits, Gardner determined from information provided by the Iron Workers Union #58 that Abshire's fringe benefits at the time of the accident were $5.94

per hour, which represents 29.1% of his hourly wage.   Gardner then determined from the information provided by the Iron Workers Union #58 that the fringe benefits for 2010 were 31.6% of Abshire's hourly wage.   Assuming a fringe benefit rate of 31.6% of salary in future years, Gardner applied the same growth rate and discount rate that he used to calculate the present value of Abshire's lost wages to calculate the present value of Abshire's lost fringe benefits.

Wood testified that the present value of Abshire's lost wages is between $499,111.63 and $811,529.50, and the present value of Abshire's lost fringe benefits is $190,240.82.   Wood began with an annual lost income of $38,877.67, which was obtained by averaging Abshire's wages for 2006, 2007, and 2008.[7]   Wood deducted an amount for taxes.   Wood determined that Abshire's work life expectancy was 27.07 years from the valuation date of June 30, 2011, which was obtained from the tables of work life expectancy published in the <u>Journal of Legal Economics</u> in the Winter of 1999-2000 and Winter of 2000-2001.   Wood assumed a future growth rate of 0% for the lower end calculation and 4.25% for the higher end calculation.   He reasoned that a range is appropriate because nobody can predict actual future income changes with certainty.   Wood applied varying discount rates over the years based on the rates of return available from United States Treasury Securities.

To calculate Abshire's lost fringe benefits, Wood determined that Abshire's fringe benefits were $5.45 per hour, representing 26.7% of his hourly wages.

---

[7] Wood does not account for potential increases in Abshire's salary due to career advancement or the overtime that he could have received working for Boh Bros.

Gardner's and Wood's figures are represented in the following chart:

| Expert | Annual Lost Wages Base | Annual Lost Overtime | Wage Increase | Work Life Expectancy | Present Value of Lost Wages | Hourly Lost Fringe Benefits | Present Value of Lost Fringe Benefits |
|---|---|---|---|---|---|---|---|
| Gardner | $40,820 | $2,000 | $0.75 per hour - 1/1/10 | 31.27 years | $1,511,622 | 31.6% of hourly wage | $616,992 |
| Wood | $38,877.67 | 0 | 0 | 27.07 years | $4,999,111.63 to $811,529.50 | 26.7% of hourly wage | $190,240.82 |

Gardner's method of calculating Abshire's lost wages by assuming he would continue to advance in his career is reasonable because of Abshire's age at the time of the accident and his proved employment history. Gardner's testimony regarding a longer work life expectancy is reasonable based on current trends in the retirement age. Gardner applied a reasonable growth rate based on past statistics in salary growth, and a reasonable discount rate based on the historical record of a relatively secure investment assumption. Further, the base amount Gardner used to calculate Abshire's lost fringe benefits is supported by documents provided by the Iron Workers Union #58. Therefore, this court accepts Gardner's lost wage and fringe benefits calculations, and awards Abshire $1,511,622, in past and future lost wages,[8] and $616,992 in past and future lost fringe benefits.

---

[8] Boh Bros., as the intervenor, is entitled to a credit for sums paid in workers' compensation benefits.

2.      **Future Medical Costs**[9]

Elizabeth Martina and Carla Seyler, professional life care planners, testified as to the cost of Abshire's future medical care.  Martina, who testified for Abshire, and Seyler, who testified for Boh Bros., both used Abshire's physicians' recommendations regarding his future care and then obtained prices for the equipment or services recommended by the physicians.  The life care plans are substantially similar.  However, the Martina life care plan includes travel costs and two possible revisions of the spinal cord stimulator that are not included in the Seyler plan.  Also, Martina uses costs for name brand prescription medications, whereas the Seyler plan uses costs for generic medications.  The life care plans were then reviewed by the economic experts, Gardner for Abshire, and Wood for Boh Bros. to obtain the present value of the plans.

Gardner used the average annual costs or frequency of care projected in the Martina plan to project the present value of the life care plan.  Gardner also did an analysis of the Seyler report based on the highest costs and highest frequency of care.  In his analysis, Gardner applied a projected life expectancy of 44.73 years, which was obtained from the Social Security Administration's 2005 Period Life Table.  Gardner then applied a growth rate of 4.09% to all medical costs, which  was the lowest growth rate in the Bureau of Labor Statistics Consumer Price Index for medical costs for the period 1996 to 2011.  Gardner applied a growth rate of 6.9% to medications based on data obtained from the Kaiser Family Foundation report on Prescription Drug Trends for September 2008, which stated that prescription prices increased on average 6.9% per year from 1997 to 2007.  Gardner applied a growth rate of 2.47% to transportation and other equipment, which is the average Bureau of Labor Statistics

[9] In his post trial memorandum, Abshire stipulates that he is not entitled to past medical expenses.

25

Consumer Price Index growth rate from May 1996 to May 2011.  Gardner then discounted the amounts by 2.97% which is the average interest rate for three month Treasury Bills from May 1996 to May 2011, adjusted for taxes.  Using this analysis, Gardner calculated the present value of Martina's life care plan to be $2,456,020, and the present value of Seyler's life care plan to be $950,820.

Gardner did an alternative calculation in which he used a 4.09% growth rate for medications, instead of the 6.9% growth rate.  Using this method, Gardner calculated the present value of the average cost and average frequency of services in Martina's life care plan to be $1,575,555, and high costs and high frequence of services Seyler's life care plan to be $831,279.

Wood also used the average annual costs or frequency of care projected in the Martina plan to project the present value of the life care plan, and did an analysis of the Seyler report based on the highest costs and highest frequency of care.  In his analysis, Wood applied a projected life expectancy of 44.74 years, which was obtained from the Social Security Administration's 2005 Period Life Table. Wood applied a 0.5% growth rate to the medical services related to the spinal cord stimulator, but did not apply any growth rate to any of the other items. Wood reasoned that the spinal cord stimulator is new technology that will experience real future price growth as resources move into its implementation, whereas the other items are in stable production and will not experience any real future growth.  Wood then discounted the amounts by discount rates that changed each year based on the interest rates of Treasury Inflation-Protected Securities ("TIPS bonds") with maturities at certain future times.  Using this analysis, Wood calculated the present value of Martina's life care plan to be $830,118, and the present value of Seyler's life care plan to be $537,383.

Gardner's and Wood's calculations are summarized in the following chart:

|  | Gardner - 6.09% growth rate for medications | Gardner - 4.09% growth rate for medications | Wood |
|---|---|---|---|
| Martina Average Cost and Frequency | $2,456,020 | $1,575,555 | $830,118 |
| Seyler High Cost and Frequency | $950,820 | $831,279 | $537,383 |

Gardner testified that the lowest growth rate in the Bureau of Labor Statistics Consumer Price Index for medical costs for the period 1986 to 2011was 4.09%, and the average Bureau of Labor Statistics Consumer Price Index growth rate from May 1996 to May 2011 was 2.47%. This demonstrates that medical costs historically have grown at a faster rate than general consumer prices. It is reasonable to assume that these trends will continue. Therefore, this court will apply a growth rate of 4.09% to medical costs, and 2.47% to other costs.

Gardner testified that the Kaiser Family Foundation report on Prescription Drug Trends dated September 2008, stated that prescription drug prices increased an average of 6.9% a year from 1997 to 2007. The Kaiser Family Foundation report on Prescription Drug Trends dated May 2010, states that the average annual growth in prescription drug prices from 2000 to 2009 was 3.6%. Because the two Kaiser Family Foundation Reports have a large disparity, applying 4.09% to prescription costs, as well as other medical costs, is reasonable. Therefore, this court will apply a 4.09% growth rate to prescription medications.

27

Further, the discount rate applied by Gardner, 2.97% , based on the average interest rate of three month Treasury Bills from May 1996 to May 2011, is reasonable because it takes into account a reasonably safe investment with a reasonable rate of return.

Therefore, this court accepts Gardner's calculation using a 4.09% growth rate for all medical costs, a 2.47% growth rate for other costs, and a 2.97% discount rate. The present value of the average costs and average frequency of services in Martina's life care plan is $1,575,555.  The present value of the high costs and high frequency of services in Seyler's life care plan is $831,279.

The primary disparity in the two life care plans is that Martina used prices for brand name prescription medications, while Seyler used prices for generic prescription medications. Abshire is currently taking some name brand prescription medications, and some generic prescription medications.  Dr. Dunn testified that Abshire's prescriptions medications may change from time to time.  It is unknown whether Abshire's future prescription medications will have generic options. According to the Kaiser Family Foundation Reports dated May 2010, approximately 80% of all FDA-approved drugs have generic counterparts, and in 2008, 72% of the total prescriptions dispensed were generic medications. Further, Gardner testified that when generic alternatives enter the market, the name brand manufactures and the generic manufactures collaborate to fix the price.  Because it is unknown whether Abshire will continue to take medications that have generic equivalents, it is reasonable to use the average of the annual cost for prescription medications listed in the Martina life care plan, and the annual cost for prescription medications to which Seyler testified.  The total of the average annual brand name prescription medication cost in the Martina life care plan is $14,780, and

at trial Seyler testified that the total annual cost of the generic prescription medications is $3,347.88.[10]

Thus, the average of those figures is $9,064. Applying a 4.09% growth rate, and a 2.97% discount rate,

the present value for prescription medications is $523,180.[11]

When the prescription medication costs used by Gardner are subtracted from Gardner's present

value calculations of $1,575,555 for the Martina life care plan, and $831,279 for the Seyler life care

plan, and replaced with the $523,180 present value for prescription medications, the present values

are $1,155,970 for the Martina life care plan, and $1,226,352 for the Seyler life care plan. This

evaluation of the Seyler life care plan does not include transportation, or two revisions of the spinal

cord stimulator.  Gardner calculated the present value for travel estimated by Martina at $11,305.  At

trial, Seyler testified that the cost of a revision of the spinal cord stimulator is $63,091.  Dr. Richter

testified that Abshire would likely require two spinal cord stimulator revisions.  It can be determined

from trial testimony that Abshire likely will have one full spinal cord stimulator revision in 20 years

and then another in 40 years, the present value of these services is $109,167.  When travel and the

spinal cord revisions are added to the $1,226,352 present value of the Seyler life care plan with the

revised prescription medication cost, the total present value is $1,346,824.

Therefore, Abshire is awarded $1,346,824 for future medical expenses, including medical

doctors' visits, psychologists' visits, diagnostic testing, therapeutic modalities, aids to independent

---

[10]   The figure that Seyler testified to at trial is differs from what was in her report and what was used
by the economists.  She testified that $3,346.88 reflects the most current information.

[11]   The formula used to obtain this number is:

Present value = $\sum$ ((9,046*1.0409$^t$)/1.0297$^t$), where t is the amount of time in the future.

living, medications, future care routines, transportation, equipment, and two revisions of the spinal cord stimulator.

**D.     Interest on Past Damages**

In <u>Williams v. Reading & Bates Drilling Co.</u>, 750 F.2d 487, 491 (5th Cir. 1985), the court held that a court may award prejudgment interest when a Jones Act claim is brought under the court's admiralty jurisdiction.  "[I]n maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." <u>Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.</u>, 71 F.3d 198, 204 (5th Cir. 1995).  "Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by the plaintiff." <u>Reeland Tubing, Inc. v. M/V CHAD G</u>, 794 F.2d 1026, 1028 (5th Cir. 1986).

Awarding interest would be inequitable in this matter because Boh Bros. paid workers' compensation benefits to Abshire from the date of the accident based on the presumption that he was not a Jones Act seaman.  This court declines to penalize Boh Bros. for asserting that position pending the appeal of this court's ruling on seaman status.

**CONCLUSION**

On the basis of the above Findings of Fact and Conclusions of Law, this court finds that

Abshire entitled to recover the following damages from Boh Bros.:

    (1)    Past, present, and future physical pain and suffering:
           One million two hundred fifty thousand dollars ($1,250,000);

    (2)    Past, present, and future mental pain and suffering:
           Seventy-five thousand dollars ($75,000) for;

    (3)    Lost wages:
           One million five hundred eleven thousand six hundred twenty-two dollars ($1,511,622), subject to a credit for the amounts paid in workers' compensation benefits by Boh Bros.;

    (4)    Lost fringe benefits:
           Six hundred sixteen thousand nine hundred ninety-two dollars ($616,992); and

    (5)    Future medical costs:
           One million three hundred forty-six thousand eight hundred twenty-four dollars ($1,346,824).

New Orleans, Louisiana, this  29th  day of September, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

31